**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 18-6219**

---

JOHNNIE WILLIAMS,

Plaintiff - Appellee,

and

SON ODARIOUS WILLIAMS,

Plaintiff

v.

LANCE CORPORAL KYLE STRICKLAND

Defendant - Appellant

and

CPL HEROUX; SGT WALTER CRIDDLE; BEAUFORT COUNTY SHERIFF OFFICE; RAYMOND S. HEROUX,

Defendants.

---

**No. 18-6220**

---

JOHNNIE WILLIAMS,

Plaintiff - Appellee,

and

SON ODARIOUS WILLIAMS,

Plaintiff,

v.

RAYMOND S. HEROUX,

Defendant - Appellant,

and

CPL HEROUX; SGT WALTER CRIDDLE; BEAUFORT COUNTY SHERIFF OFFICE; LANCE CORPORAL KYLE STRICKLAND,

Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Beaufort. Patrick Michael Duffy, Senior District Judge. (9:15-cv-01118-PMD)

---

Argued: December 13, 2018            Decided: March 5, 2019

---

Before KEENAN, FLOYD, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Floyd wrote the opinion in which Judge Keenan and Judge Thacker joined.

---

**ARGUED:** Elloree A. Ganes, HOOD LAW FIRM, LLC, Charleston, South Carolina; Mary Bass Lohr, HOWELL, GIBSON & HUGHES, P.A., Beaufort, South Carolina, for Appellants. Jordan Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina for Appellee. **ON BRIEF:** Whitney B. Harrison, MCGOWAN, HOOD & FELDER, LLC, Columbia, South Carolina, for Appellee.

---

FLOYD, Circuit Judge:

Johnnie Williams brought suit under 42 U.S.C. § 1983 against two law enforcement officers: Kyle Strickland and Raymond Heroux. Williams claimed that the officers violated his Fourth Amendment rights by using deadly force while arresting him. The officers moved for summary judgment on the basis of qualified immunity. The district court denied their motions, and the officers now appeal. For the reasons that follow, we affirm.

I.

On June 29, 2012, Williams drove from Georgia to South Carolina to visit a relative. His six-year-old son was with him. When Williams and his son arrived in South Carolina, they stopped at a gas station. There, Williams ran into an acquaintance, Anthony Ancrum, who needed a ride to his apartment. Ancrum's apartment complex was nearby, and Williams offered to drive him.

On the way to the apartment complex, Williams crossed paths with Officer Heroux, who was on duty in a patrol car. Heroux ran Williams's license plate through dispatch and learned that the plate had been stolen. He followed Williams into the parking lot of the apartment complex, where he turned on his blue lights. In response, Williams pulled into a parking space. Heroux got out to approach him. Two other officers, Kyle Strickland and Walter Criddle, arrived on the scene.

What happened over the next several seconds forms the heart of this appeal. When

3

Heroux was about ten feet from Williams's car, Williams shifted the car into reverse and cut the wheel, causing the front end of the car to swivel in Heroux's direction. Heroux, believing himself to be in danger, stepped back and drew his gun. At the same time, Strickland started walking toward Williams's car. Williams then put the car in drive, straightened out, and drove toward Strickland.

Heroux and Strickland opened fire on the car. Crucially, it is not clear—at this stage—how far Williams got before Heroux and Strickland started shooting. He may have been headed toward Strickland. He may have been passing by Strickland, such that Strickland was alongside the car and out of the car's trajectory. Or he may have already driven past Strickland, such that Strickland, like Heroux, was behind the car.

One of Heroux's shots hit Williams in the back.[1] Williams lost control of the car and crashed into a tree. He was airlifted to the hospital for emergency surgery, after which he was placed in a medically induced coma. Despite several subsequent surgeries, Williams has, among other things, "lost the full and proper function of his bowels, lungs, and other bodily systems." J.A. 45.

Years later, Williams was charged with three counts of assault and battery related to the incident. He pleaded guilty. As part of his plea deal, he admitted that he had deliberately rotated the car in Heroux's direction and that he had driven towards Strickland. Notably, Williams also agreed as part of his plea deal that the officers had started shooting only after his car had driven past them.

---

[1] Ancrum, too, was injured, but he is not party to this action.

4

In 2015, Williams filed a § 1983 suit against Strickland, Heroux, and other defendants who are no longer parties to the action. He alleged that by firing on him during the course of his arrest, the officers had subjected him to excessive force, violating his rights under the Fourth Amendment.

After discovery, Strickland and Heroux each moved for summary judgment on the basis of qualified immunity. In relevant part, the officers argued that they were entitled to summary judgment because the undisputed facts showed that they had not violated Williams's clearly established rights. More specifically, they argued that when they opened fire on Williams, they believed that Williams was about to hit Strickland with his car; under those circumstances—according to the officers—Williams had no clearly established right to be free from the use of deadly force.

The district court denied the officers' motion. The court determined that a reasonable jury, viewing the evidence in the light most favorable to Williams, could conclude that when the officers discharged their weapons, Williams's car was either (a) in the process of passing Strickland or (b) already past Strickland. According to the district court, if either (a) or (b) were true, then the officers' use of deadly force would have violated rights that we clearly established in *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005). Since a reasonable jury could conclude that the officers had acted in a way that violated Williams's clearly established rights, the district court held that the officers were not entitled to summary judgment. The officers now appeal.[2]

---

[2] We note that Heroux brings an additional appeal, separate from Strickland. Below,

5

II.

Our first task here is to determine whether, and to what extent, we may subject the district court's order to appellate review. Generally, our jurisdiction is limited to final decisions of the district court. 28 U.S.C. § 1291; *Martin v. Duffy*, 858 F.3d 239, 246 (4th Cir. 2017). This means that we cannot normally review a district court's order denying summary judgment, since orders denying summary judgment are interlocutory, not final. *Hensley v. Horne*, 297 F.3d 344, 347 (4th Cir. 2002). There are, however, exceptions. One exception is the "collateral order doctrine," which "permits appellate review of a small class of orders that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Adams v. Ferguson*, 884 F.3d 219, 223–24 (4th Cir. 2018) (internal quotation marks omitted).

A district court's denial of summary judgment on the basis of qualified immunity is a collateral order and therefore subject to immediate appellate review, despite being interlocutory. *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008). Our review of such

Heroux moved for summary judgment on the ground that Williams's claim against him was untimely. The district court denied his motion. He asks us to reverse. But a denial of summary judgment on statute-of-limitations grounds is an interlocutory order, and in general, such orders are not immediately appealable. *Cf. Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 769–70 (4th Cir. 1995) (reviewing order denying summary judgment on statute-of-limitations grounds because the district court had certified its order for appeal). Heroux fails to advance any argument as to why we should—or may— exercise appellate jurisdiction over the district court's rejection of his statute-of-limitations defense in this case. Accordingly, we leave that portion of the district court's order undisturbed.

orders is limited to a narrow legal question: if we take the facts as the district court gives them to us,[3] and we view those facts in the light most favorable to the plaintiff, is the defendant still entitled to qualified immunity? *Id*.; *see also Brown v. Elliott*, 876 F.3d 637, 641–42 (4th Cir. 2017) ("[W]hen resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Waterman*, 393 F.3d at 473 ("In reviewing the denial of summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff."). Significantly, we cannot reach whether the plaintiff has produced enough evidence to survive summary judgment. *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

What this amounts to is: We may review the portion of the district court's order denying Strickland and Heroux's motions for summary judgment on the basis of qualified immunity. But our review may reach only one question: would the officers be entitled to qualified immunity if a jury concluded that they had fired on Williams when they were no longer in the trajectory of Williams's car? We turn to that question now.

---

[3] This is not to say that we are strictly confined to the four corners of the district court's order: we may assume some facts when the district court does not explicitly state them, provided that we draw all inferences in the plaintiff's favor. *See Smith v. Ray*, 781 F.3d 95, 98 (4th Cir. 2015) ("To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." (internal quotation marks omitted)).

III.

Qualified immunity "protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct." *Iko*, 535 F.3d at 233. Given this standard, we must determine two things. First, if Strickland and Heroux fired on Williams after they were no longer in the path of Williams's car, did they violate Williams's Fourth Amendment right to freedom from excessive force? Second, as of June 29, 2012, was it clearly established that using deadly force against Williams after the officers were no longer in the car's trajectory would violate Williams's right to freedom from excessive force?[4] The answer to both questions is yes.

A.

The Fourth Amendment prohibits law enforcement officers from using excessive force to make a seizure. *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). "Whether an officer has used excessive force is analyzed under a standard of objective reasonableness." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

Because deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable. *See Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means

---

[4] We do not need to answer these questions in sequence. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But in this case, we see no reason not to.

8

of deadly force is unmatched.").  Indeed, an officer may reasonably apply deadly force to a fleeing suspect—even someone suspected of committing a serious felony—only if the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Id.* at 3.[5]  And even a "significant threat of death or serious physical injury" to an officer does not justify the use of deadly force unless the threat is "immediate."  *Id.* at 3, 11; *accord Henry*, 652 F.3d at 532.

Over a decade ago, we applied these principles when deciding *Waterman v. Batton*, a case that bears striking similarities to the one at hand.  There, we held that officers who used deadly force against the driver of a car had not violated the Fourth Amendment when, in the aftermath of a high-speed chase (during which the driver had reportedly tried to run an officer off the road), the officers were standing in or immediately adjacent to the car's forward trajectory, and the car "lurched forward" and "began to accelerate," such that the officers reasonably believed that the car was going to run them over "in approximately one second."  393 F.3d at 474-76, 475 n.6.  We also held that the same officers *had* violated the Fourth Amendment to the extent that they started to use deadly force, or continued to use deadly force, once the car had driven by them—i.e., once it was no longer reasonable for them to believe that the car was about to run them (or their fellow officers) over.  *Id.* at 482.  This was true even though mere seconds separated the point at which deadly force was lawful from the point at which deadly force was

---

[5] Nothing in the record or the parties' briefs suggests that Williams posed a significant threat to anyone but the officers at any point during the encounter at issue; therefore, there is no need for us to consider the "or others" portion of the standard.

unlawful. *Id.* As we put it then, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Id.* at 481.

Following *Waterman*, we have no difficulty concluding that if Strickland and Heroux started or continued to fire on Williams after they were no longer in the trajectory of Williams's car, they violated Williams's Fourth Amendment right to freedom from excessive force.[6]

B.

Despite having violated a plaintiff's constitutional right, defendants may be entitled to immunity from the plaintiff's suit for damages if, at the time of the violation, the plaintiff's right was not "clearly established." *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018). To determine whether a right was clearly established, we typically ask whether, when the defendants violated the right, there existed either controlling authority (such as a published opinion of this Court) or a "robust consensus of persuasive authority," *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (internal quotation marks omitted), that would have given the defendants "fair warning that their conduct," under the circumstances, "was wrongful," *Williamson*, 912 F.3d at 187 (internal quotation marks omitted).

---

[6] We note that this conclusion is consistent with our opinion in *Krein v. Price*, 596 F. App'x 184, 189–90 (4th Cir. 2014), which dealt with similar circumstances and applied *Waterman* in substantially the same way.

10

The "clearly established" inquiry has some important guideposts. On the one hand, the Supreme Court instructs us "not to define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). On the other hand, defendants can violate clearly established law even under "'novel factual circumstances.'" *Stirling*, 912 F.3d at 187 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also id.* (stating that "clearly established law encompasses not only specifically adjudicated rights, but also those [rights] manifestly included within more general applications of the core constitutional principles invoked" (internal quotation marks omitted)). Thus, although we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense. In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two.

That said, the instant case requires no subtle line-drawing: The right that the officers allegedly violated falls well within the ambit of clearly established law. When we decided *Waterman*, in 2005, we clearly established that (1) law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the

11

car's trajectory. 393 F.3d at 480–82. *Waterman* obviously and manifestly encompasses the facts of this case. In light of *Waterman*, there can be no question that the right Williams seeks to vindicate was clearly established on the day he was shot.

To summarize: A reasonable jury could conclude that Strickland and Heroux acted in a way that, as a matter of law, violated Williams's clearly established federal rights— specifically, his Fourth Amendment right to freedom from excessive force. Therefore, the officers are not entitled to summary judgment on the basis of qualified immunity, and the district court correctly denied their motions.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.