**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1906**

KATHY LIVINGSTON, as Administratrix of The Estate of John David Livingston, II; MICHAEL CARDWELL; CHRISTINE BROOM; WESLEY WRIGHT; TYRONE BETHUNE; RYAN HOLLOWAY,

Plaintiffs – Appellees,

v.

NICHOLAS KEHAGIAS, both individually and in his official capacity as law enforcement officer with the Harnett County Sheriff's Department; JOHN WERBELOW, both individually and in his official capacity as a law enforcement officer with the Harnett County Sheriff's Department; MICHAEL BRANDON KLINGMAN, both individually and in his official capacity as a law enforcement officer with the Harnett County Sheriff's Department, JOHN KNIGHT, both individually and in his official capacity as a law enforcement officer with the Harnett County Sheriff's Department; LARRY ROLLINS, in his official capacity as Sheriff of Harnett County, North Carolina; WAYNE COATS, in his official capacities as a Mayor and Sheriff of Harnett County, North Carolina; WESTERN SURETY COMPANY, as Surety,

Defendants – Appellants.

------------------------------

NORTH CAROLINA POLICE BENEVOLENT ASSOCIATION; SOUTHERN STATES POLICE BENEVOLENT ASSOCIATION,

Amici Supporting Appellant,

PUBLIC JUSTICE CENTER; NORTH CAROLINA ADVOCATES FOR JUSTICE,

Amici Supporting Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, Chief District Judge.  (5:16-cv-00906-BO)

Argued:  October 30, 2019                                    Decided:  February 25, 2020

Before DIAZ, HARRIS, and RUSHING, Circuit Judges.

Dismissed in part; judgment affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Harris wrote the opinion, in which Judge Diaz and Judge Rushing joined.

**ARGUED:**  Dan McCord Hartzog, Jr., CRANFILL SUMNER & HARTZOG LLP, Cary, North Carolina, for Appellants.  Matthew David Ballew, ZAYTOUN LAW FIRM, PLLC, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  Carl M. Newman, Katherine M. Barber-Jones, James C. Thornton, CRANFILL SUMNER & HARTZOG LLP, Raleigh, North Carolina; Monica Langdon Jackson, COUNTY OF HARNETT, Lillington, North Carolina, for Appellants.  Robert E. Zaytoun, John R. Taylor, Charles K. McCotter, Jr., ZAYTOUN LAW FIRM, PLLC, Raleigh, North Carolina; Jesse Womble Jones, Lillington, North Carolina, for Appellees.  J. Michael McGuiness, THE MCGUINESS LAW FIRM, Elizabethtown, North Carolina; Megan Milliken, MILLIKEN LAW, Wilmington, North Carolina, for Amici Southern States Police Benevolent Association and North Carolina Police Benevolent Association.  Ejaz H. Baluch, Jr., Murnaghan Appellate Advocacy Fellow, PUBLIC JUSTICE CENTER, Baltimore, Maryland; Burton Craige, Narendra Ghosh, PATTERSON HARKAVY LLP, Raleigh, North Carolina, for Amici Public Justice Center and North Carolina Advocates for Justice.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

This appeal arises from five incidents in which police officers are alleged to have conducted unreasonable searches and seizures, used excessive force, and, in one instance, used deadly force without justification. The district court denied the officers' motion for summary judgment, finding that genuine disputes of fact precluded an award of qualified immunity at this stage of the litigation.

On appeal, the officers challenge only selected portions of the district court's ruling, disputing the court's resolution of some, but not all, of the claims in question. And the scope of this appeal is further narrowed by its interlocutory posture: On interlocutory review of a denial of qualified immunity, we may review legal questions, but not a district court's determination that the pretrial record gives rise to genuine disputes of fact.

Consistent with that limit on our jurisdiction, we must dismiss much of the officers' appeal, as it rests in large part on disagreement with the district court's assessment of the record evidence. To the extent the officers have identified legal questions that we may review on interlocutory appeal, we affirm in part and reverse in part the district court's judgment. The district court properly denied qualified immunity on one of the plaintiff's excessive force claims, because, as the court explained, on the facts taken in the light most favorable to the plaintiff, established law would make clear to a reasonable officer that the non-deadly force used was disproportionate. But the district court erred, we find, in denying qualified immunity on a different plaintiff's unreasonable seizure claim, because clearly established law would not have put the officers on notice that they lacked probable cause for a mental health seizure.

3

**I.**

This case began when six plaintiffs sued a group of police officers in Hartnett County, North Carolina, in connection with five incidents that occurred between January and November of 2015. Each incident involved different and overlapping groups of police officers, with one officer – Deputy Sheriff Nicholas Kehagias – present in four of the five encounters.[1]

The "gravamen" of the complaint, as the district court described it, was that the defendant officers "repeatedly engaged in grossly improper conduct and applied excessive and unreasonable force." J.A. 102. According to the plaintiffs, their cases were part of a larger pattern in which certain officers "brutalized, wrongfully detained, and humiliated" Hartnett County residents with impunity. *Id.* at 108. The plaintiffs' specific allegations featured warrantless, unlawful and sometimes forcible or middle-of-the-night home entries; unlawful seizures and arrests, frequently accompanied by unprovoked excessive force; and, in one case, the unjustified use of deadly force.

---

[1] The three plaintiffs with claims at issue on appeal are the Estate of John Livingston; Tyrone Bethune; and Michael Cardwell. The other three plaintiffs in the underlying action are Ryan Holloway (who sued in connection with Bethune over the same incident), Christine Broom, and Wesley Wright. In addition to Nicholas Kehagias, the defendant officers sued in their individual capacities are John Werbelow, Michael Brandon Klingman, and John Knight. Sheriffs Larry Rollins and Wayne Coats are named as defendants in their official capacities in connection with the plaintiffs' claim against the Hartnett County Sheriff's Office.

The plaintiffs brought their action under § 1983, claiming, *inter alia*, that the defendants involved in each of their incidents violated some combination of their Fourth Amendment rights to be free from unreasonable searches, from unreasonable seizures, and from excessive force. The plaintiffs also raised state-law claims and, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a § 1983 claim against the Hartnett County Sheriff's Office, alleging that the Office failed to train its deputies and maintained a policy or custom of condoning misconduct and the unlawful use of force. The district court denied the defendant officers' motion to sever the claims of the individual plaintiffs for trial, and denied most of a subsequent motion for judgment on the pleadings, dismissing from the case only certain state-law causes of action.

After discovery, the officers filed the motion for summary judgment at issue here, arguing primarily that they are entitled to qualified immunity on the constitutional claims against them. In a thorough opinion, the district court denied the motion. The key problem, as the district court explained, was that "the plaintiffs' and defendants' versions of events are in stark contrast, with defendants disputing much of what plaintiffs contend occurred." J.A. 2677. Primarily because of genuine record disputes over facts on which the officers relied for their qualified immunity defense, the court concluded, qualified immunity could not be awarded at this stage of the litigation. *See*, *e.g.*, *id.* at 2699 ("Because the facts relied on by the defendants to argue that the rights violated were not clearly established are in dispute, defendants have not" shown an entitlement to qualified immunity as a matter of law).

5

For the same reason, the district court held that the officers were not entitled to summary judgment on their claim of state-law public officer immunity against the plaintiffs' state-law claims. And "genuine issues of material fact" likewise precluded summary judgment against the plaintiffs on their *Monell* claim. *Id.* at 2707; *see id.* at 2709 (municipal liability under *Monell* is "properly a question for the jury in this case").

The officers timely filed this interlocutory appeal, challenging the denial of summary judgment on their qualified immunity defenses.

## II.

We review de novo a district court's denial of qualified immunity at summary judgment. *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016). The standard we apply is the same as that used by the district court: We view the facts in the light most favorable to the nonmoving party – here, the plaintiffs – and recognize that summary judgment may be granted only if "no material facts are disputed" and the officers are "entitled to judgment as a matter of law" on their qualified immunity claim. *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003); *see Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); Fed. R. Civ. P. 56(a).

The posture of this appeal narrows the scope of our review in an important respect. As a general matter, denials of summary judgment are interlocutory orders not subject to appellate review. *See Williams v. Strickland*, 917 F.3d 763, 767 (4th Cir. 2019). There is an exception, however, for denials of summary judgment as to qualified immunity, which may be appealed immediately under the collateral order doctrine. *See id.* at 768. But such

6

an appeal is limited to legal questions; our jurisdiction extends only to the denial of qualified immunity "to the extent it turns on *an issue of law*." *Gould v. Davis*, 165 F.3d 265, 268 (4th Cir. 1998) (emphasis added). By contrast, we have no jurisdiction to "review the district court's order 'insofar as that order determines whether or not the pretrial record sets forth a "genuine" issue of fact for trial.'" *Id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 320 (1995)).

What that means is that we may not consider, in this posture, any argument that the district court misapprehended the record, finding genuine issues of fact where none exist. To the extent the officers argue that the plaintiffs have adduced insufficient evidence to create genuine disputes as to material facts, we have no jurisdiction to address that claim. *See Winfield v. Bass*, 106 F.3d 525, 529–30 (4th Cir. 1997) (en banc). "Whether we agree or disagree with the district court's assessment of the record evidence," in other words, "is of no moment in the context of this interlocutory appeal." *Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010); *see also Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) ("In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor."). Rather, our review of the district court's judgment is "limited to [one] narrow legal question: *if we take the facts as the district court gives them to us*, and we view those facts in the light most favorable to the plaintiff," are the defendant officers "still entitled to qualified immunity?" *Strickland*, 917 F.3d at 768 (emphasis added).

With the boundaries of our appellate jurisdiction firmly in mind, we turn now to the arguments on appeal.

7

**III.**

The defendant officers have chosen to appeal only a limited portion of the district court's ruling denying summary judgment on qualified immunity grounds. As to two of the incidents – those involving plaintiffs Christine Broom and Wesley Wright – the officers take no appeal on any claim. As to the remaining three incidents, the officers appeal the denial of qualified immunity on some, but not all, of the plaintiffs' claims. Specifically, the officers appeal the denial of qualified immunity on each of the claims raised by the Estate of John Livingston – unlawful entry and arrest, excessive force in effectuating the arrest, and unjustified use of deadly force – and on the unreasonable seizure but not the excessive force claims of plaintiffs Tyrone Bethune and Michael Cardwell.[2] For each claim on appeal, the officers argue that they are entitled to qualified immunity as a matter of law.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In practice,

---

[2] With respect to Cardwell's excessive force claim against the relevant officers, the district court purported to deny summary judgment on qualified immunity grounds. As the officers note, however, it appears that they in fact had not moved for summary judgment as to that claim. Regardless, we have no occasion to consider Cardwell's excessive force claim here.

8

qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

As the district court explained, determining whether a state official is entitled to qualified immunity is a two-step inquiry. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 236 (granting courts discretion as to order in which two steps are addressed). At the first step, the court asks "whether a constitutional violation occurred," "viewing the facts and drawing the reasonable inferences in the light most favorable to the plaintiff." J.A. 2688 (citation omitted). At the second, the court considers whether "the right violated was clearly established" at the time. *Id.* Courts "do not require a case directly on point," as the district court recognized, to conclude that the law was clearly established. *Id.* at 2692 (quoting *al-Kidd*, 563 U.S. at 742). What matters is that it "would be clear to a reasonable officer that his or her conduct was unlawful in the particular situation that he or she confronted," *id.*; *see Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).

We now discuss each of the claims in question. And because this is an interlocutory appeal of a denial of qualified immunity at summary judgment, we recount the facts as the district court viewed them, in the light most favorable to the plaintiffs, unless otherwise noted. *See Strickland*, 917 F.3d at 768.

**A.**

*Estate of Livingston*

In the predawn hours of November 15, 2015, Deputy Kehagias shot and killed John Livingston at his home. The events leading up to the shooting began when Kehagias entered Livingston's home without a warrant and over Livingston's objections, allegedly

9

by kicking open the front door. When Kehagias tried to arrest Livingston – because, Kehagias claims, Livingston had lied to him and then struck his foot with the door while trying to push it closed – Livingston refused to give his hands to be handcuffed. After a struggle in which Kehagias and another officer repeatedly used a taser, pepper-spray, and physical force on Livingston, who in the plaintiff's telling was offering only passive resistance, Kehagias fired the shots that killed Livingston.

Livingston's estate sued, alleging unlawful entry and arrest, excessive force in effectuating the arrest, and the unjustified use of deadly force, all in violation of the Fourth Amendment. The officers appeal the denial of qualified immunity on all three of those claims.

1.

Deputies Kehagias and Werbelow arrived at Livingston's home at about 3:40 a.m., allegedly in search of Lonnie Setzer, an individual suspected of committing a misdemeanor. Though Setzer was not in the house, three other individuals were present along with Livingston, and witnessed the events that followed.

According to the plaintiff, when Livingston answered the door, Deputy Kehagias asked if Setzer was in the home, and Livingston replied truthfully that he was not. Kehagias remembers it differently, claiming that he asked if anyone else was present, and that Livingston lied when he answered in the negative. In either event, Kehagias did not believe Livingston, and asked to come inside – without a warrant – to look for Setzer. Livingston declined, attempting to close the door, and Kehagias entered anyway, though the details

are disputed: Either Kehagias put his foot in the doorway, where it was hit by the door as Livingston closed it; or Kehagias kicked the door open just before it closed.

Immediately upon entering, Deputy Kehagias went to Livingston, now sitting in a chair, pulled him up by his arm, and pushed him against the wall to arrest him – for, Kehagias says, the misdemeanor offenses of hitting his foot with a door and lying to him at the doorway about the home's occupants. According to witness Clayton Carroll, Kehagias then deployed a taser against Livingston for the first time, causing Livingston to fall to the ground. On the ground with Kehagias on top of him, Livingston refused to give up his hands. In the course of their minutes-long struggle, Kehagias pepper-sprayed Livingston, tased him two more times, and put his gun to Livingston's head and threatened to kill him. Werbelow participated as well, twice pepper-spraying Livingston. Witness Carroll also recalls the two officers elbowing Livingston in the head, causing his head to hit the tile floor and bleed.

The final stage of the struggle took place on Livingston's front porch, where the officers had dragged Livingston. After kneeing and kicking Livingston, Kehagias again used his taser against him. What happened next with respect to the taser is critically disputed. Kehagias at some point yelled, "he's got my taser" – referring to Livingston. J.A. 2685. According to Kehagias, Livingston indeed had taken control of the taser and deployed it against him. But according to witness accounts, Livingston touched the taser only in an effort to remove it from his body, and never controlled it or used it against Kehagias. Kehagias then drew his gun and shot and killed Livingston.

2.

11

Livingston's estate sued, claiming that the officers violated Livingston's Fourth Amendment rights at each stage of their encounter with him:  the warrantless home entry and arrest, the use of force to effectuate the arrest, and the final use of deadly force.  On all three claims, the district court denied the officers summary judgment based on qualified immunity.  Viewing the facts in the light most favorable to the plaintiff, the district court concluded, the Estate "ha[s] established that [Livingston's] Fourth Amendment rights . . . were violated and that the rights as they existed in these circumstances were clearly established." *Id.* at 2701.

As to home entry and arrest, the district court began, governing law was clear and undisputed:  A seizure or arrest effected without probable cause is unreasonable under the Fourth Amendment, and a warrantless and non-consensual home entry is presumptively unreasonable, though it may be excused in certain exigent circumstances.   And under that well-established law, the court found, on the facts as viewed most favorably to the plaintiff, it was clear at the time that "Kehagias was without justification in his warrantless entry into Livingston's home and arrest of Livingston."  *Id.*; *see also id.* at 2705 (finding that Livingston's right to be free from the alleged unlawful entry and seizure was "clearly established" in November 2015).

The officers' only contrary argument, the district court explained, rested entirely on disputed factual points.  The officers claimed, for instance, that they had probable cause to arrest Livingston because "he lied to Kehagias about whether there were any other people in the house."  *Id.* at 2701–02.  But on the plaintiff's version of events, there was no lie; Kehagias had asked only whether *Lonnie Setzer* was present, and Livingston had truthfully

12

replied that he was not. And the officers' alternative theory – that there was probable cause to arrest Livingston for "assaulting an officer" because Kehagias's foot, in Livingston's doorway, was struck when Livingston attempted to close the door – likewise rested on a disputed factual premise: that Kehagias had put his foot in the doorway before Livingston tried to close it, rather than kicking the door open after it was almost fully closed. *Id.* at 2702. And on no theory, the district court finished, could the officers – who even on their *own* account were searching for a person who may have been involved in a misdemeanor crime, and then developed cause to arrest Livingston for misdemeanor offenses – show, based on those minor charges, an exigency that would rebut the presumption against warrantless home entries.

Turning to the use of force, the district court concluded that on the facts construed in favor of the plaintiff, the officers' use of non-deadly force to effectuate Livingston's arrest was excessive and hence constitutionally unreasonable under the factors laid out in *Graham v. Connor*, 490 U.S. 386 (1989). The severity of the crime allegedly at issue – a misdemeanor – was minor. There was no indication of any immediate threat to the officers from Livingston, who prior to being "forcibly taken down to the ground by Kehagias []" had offered no resistance whatsoever," and went on to offer only "passive resistance." J.A. 2703. Under those circumstances, the district court held, the full array of force used against Livingston – who, among other things, was "elbowed in the head so that his head hit the tile floor and began to bleed, [] threatened with Kehagias's firearm, tased, and pepper sprayed in the face" – was objectively unreasonable. *Id.* at 2704.

13

With respect to the use of deadly force – justified, as the court explained, only where an "officer has sound reason to believe that the suspect poses a serious threat of physical harm," *id.* – the court held that factual disputes precluded summary judgment. Kehagias justified his use of force on one ground: that Livingston "had taken control of the taser and had in fact tased Kehagias before Kehagias retrieved his gun and shot Livingston." *Id.* But that account was disputed by the witnesses. Viewing the record facts in the light most favorable to the plaintiff, the court determined, there was evidence to show that Livingston never presented a threat that could justify deadly force: Though he touched the taser in an effort to remove it from his body, he never controlled the taser or used it against Kehagias. While a jury ultimately might credit Kehagias's account, the court concluded, the discrepancy in the evidence precluded an award of qualified immunity on summary judgment.

Finally, the court applied the second prong of the qualified immunity analysis to the use of force claims, and found that Livingston's right to be free from excessive force under the circumstances, including deadly force, was "clearly established in November 2015." *Id.* at 2705. By 2015, the district court reasoned, case law made clear that on the plaintiff's version of the facts, the force used by the officers was "unnecessary [and] disproportionate" to the need to "seize an unarmed individual for a minor offense." *Id.* The court acknowledged the officers' primary argument to the contrary, focused on the initial use of non-deadly force: that it was not until 2016, in *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016), that this court established that "a taser may not be deployed 'in the face of stationary and non-violent resistance to being

14

handcuffed.'" J.A. 2705 (quoting *Armstrong*, 810 F.3d at 909–10). But here, the district court observed, "the force utilized by Kehagias and Werbelow during the Livingston encounter was not limited to deploying a taser." *Id.* Considering "all of the facts with an eye toward the proportionality of the force used," Livingston's right to be free of the full panoply of non-deadly force used against him, "in a circumstance involving a minor crime[] and no active resistance, and where plaintiffs' evidence establishes that defendant Kehagias 'took an unreasonably aggressive tack that quickly escalated,' was clearly established" at the time. *Id.* (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. Mar. 2015)).

3.

The officers now appeal the denial of summary judgment based on qualified immunity as to all three of the Estate's claims against them. With respect to the claims for unlawful entry and arrest and for the unreasonable use of deadly force, we must dismiss the officers' appeal as outside our limited jurisdiction in this interlocutory posture. With respect to the claim for the unreasonable use of non-deadly force to effectuate Livingston's arrest, we affirm the district court's denial of summary judgment.

The officers' appeal of the unlawful entry and arrest claim centers on the same argument they presented to the district court: that their entry and attempted arrest were reasonable under the Fourth Amendment because there was probable cause that Livingston had committed misdemeanor offenses, first by lying to them about the home's occupants and then by touching Deputy Kehagias's foot with the door when he attempted to close it. The district court, as described above, found that genuine factual disputes precluded an award of summary judgment on either of these theories. And while the officers argue that

15

the district court was mistaken, and that the record in fact does not give rise to genuine factual disputes on these points, that kind of fact- and record-based claim falls outside the scope of our review in this posture. *See Gould*, 165 F.3d at 268 (finding absence of jurisdiction to "review the district court's order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial") (internal quotation marks omitted). Because the officers' contention that they are entitled to qualified immunity on this claim rests on disagreement with the district court's "assessment of the record evidence," *Culosi*, 596 F.3d at 201, it is not properly before us, and we must dismiss that portion of the appeal.[3]

For the same reason, we also must dismiss the officers' appeal as to the deadly force claim. Here again, the officers' argument is that the district court misapprehended the summary judgment record, this time by determining that the evidence, construed in the light most favorable to the plaintiff, supported a finding that Livingston had never controlled the taser or used it against Kehagias. Parsing the witness statements relied on by the district court, the officers assert that the pretrial evidence, properly understood, is not enough to put into genuine dispute their version of the facts, on which Livingston *had*

---

[3] Likewise, we may not review the officers' contention that their warrantless home entry was justified by exigent circumstances because they were in hot pursuit of a misdemeanor arrest. That argument depends on the existence of probable cause for an arrest – which, as explained above, itself turns on disputed issues of fact. We have no jurisdiction to reconsider the district court's determination that there are genuine issues of fact for trial as to the existence of probable cause, and therefore dismiss the officers' appeal on this claim, as well.

16

gained control of the taser and used it against Kehagias. But considering the record as a whole and viewing it favorably to the plaintiff, the district court came to a different conclusion. And in this procedural posture, we must accept the record as the district court viewed it; our limited jurisdiction does not allow us to address the officers' contention that the Estate has not brought forward sufficient evidence to create genuine disputes as to these critical facts. *See Winfield*, 106 F.3d at 529–30.[4]

We take a different approach to the officers' appeal regarding the use of non-deadly force to effectuate Livingston's arrest. Here, in contrast to the other claims, the officers have identified *legal* issues that we may review in this interlocutory posture: Whether, accepting the district court's assessment of the record and view of the facts, the officers are

---

[4] The police officers also argue that even if there is a genuine factual dispute about whether Livingston *actually* controlled the taser, it is undisputed that Kehagias *thought* he did – given Kehagias's shout of "he's got my taser" – and that Kehagias is entitled to qualified immunity on that ground alone. The district court did not separately address that argument, probably because it was raised only in passing, at best, before that court. In any event, to the extent this presents a legal claim that we may review on appeal, we disagree with the officers. It is true that the Estate appears not to dispute the fact of Kehagias's shout. But it does not follow, as the officers assume, that there can be no dispute as to Kehagias's actual state of mind; a jury could choose not to credit the statement by Kehagias, whose reliability as a witness repeatedly has been called into question in this case, sometimes in directly analogous circumstances. *See, e.g.*, J.A. 2684 (quoting testimony from Wright in which he said he was handcuffed and not resisting when Kehagias nevertheless shouted, "Stop. You're resisting," before macing and beating him). And even if Kehagias did believe that Livingston had his taser and posed an immediate threat to his safety, his use of deadly force would be justified only if that belief was objectively reasonable. *See Smith*, 781 F.3d at 103. On the factual record as viewed by the district court, a reasonable jury could find that under all the circumstances, Kehagias had no reasonable basis for fearing that his taser could be used against him by Livingston. *See id.* (officer is not entitled to qualified immunity as a matter of law where, drawing inferences in favor of the plaintiff, a jury could find the officer's perceptions unreasonable).

17

entitled to qualified immunity as a matter of law, either because they reasonably used non-deadly force and so committed no constitutional violation, or because no clearly established law put them on notice that their use of non-deadly force was constitutionally excessive. On these questions, we agree with the district court, and thus affirm its ruling denying summary judgment.

"The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). As the district court explained, whether a use of force is excessive is an objective inquiry, based on the factors set out in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. We "view [the force used] in full context, with an eye toward proportionality of the force in light of all the circumstances." *Smith*, 781 F.3d at 101 (citation omitted); *see* J.A. 2705 (quoting *Smith*). Ultimately, the question to be decided is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Smith*, 781 F.3d at 101 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

We agree with the district court that on the pretrial evidence, viewed in the light most favorable to the Estate, the force used by Deputies Kehagias and Werbelow to effectuate Livingston's arrest was disproportionate to the circumstances and thus constitutionally excessive. First, as the district court found and as the officers concede, the crimes of which the officers allegedly suspected Livingston were minor – which means that there was no reason for them to believe that Livingston, a suspected misdemeanant,

18

would become dangerous. *See Smith*, 781 F.3d at 102. Second, and critically, during this part of the encounter, Livingston posed no threat to the officers' safety: There is no evidence that Livingston physically attacked or attempted to attack the officers, and there is no suggestion that he was or appeared to be armed with a weapon.

Third and finally, there is the question of Livingston's resistance. According to the district court, viewed in the light most favorable to the Estate, the pretrial record supports a finding that Livingston was neither actively resisting arrest nor attempting to flee. And while the officers again challenge the court's reading of the record, as discussed above, we must in this posture take the district court's view of the facts as a given: For purposes of our review, Livingston was not "actively resisting arrest" under *Graham*. *See* 490 U.S. at 396. Indeed, as the district court noted, on the Estate's account of events, backed by witness testimony, Livingston was offering *no* resistance of any kind, passive or otherwise, until *after* he was forcibly pulled from his seat and taken to the ground by Kehagias – a level of force that by itself has been deemed constitutionally excessive when deployed against a "stationary individual" suspected only of a misdemeanor. J.A. 2703 (quoting *Geba v. Norris*, 2016 WL 8730898, at *6 (E.D. Va. Apr. 4, 2016)). And after that point, Livingston's only resistance was of the passive variety, in the form of refusing to give up his hands for handcuffs.

The ultimate question, as the district court recognized, is whether under the *Graham* factors and in light of all the circumstances, the officers used proportionate force in what they allege was an effort to arrest Livingston for two misdemeanor offenses committed after they attempted to search his home in the middle of the night and without a warrant.

19

On the record as it comes to us on this interlocutory appeal, the officers were faced with an individual who had committed, at most, minor offenses; did not attempt to attack the officers; was not and did not appear to be armed; and offered no resistance until after he was suddenly brought to the ground, and only passive resistance after that. The force the officers deployed against Livingston included elbowing him in the head, causing it to bleed; kneeing and kicking him; threatening to kill him with a gun to the head; and repeatedly pepper-spraying and using a taser against him. Like the district court, we think the mismatch here between provocation and response is great enough to render the officers' actions "unnecessary, gratuitous, and disproportionate" in violation of the Fourth Amendment. *Id.* at 2704 (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744–45 (4th Cir. 2003)).

We likewise agree with the district court that it would have been "clear to a reasonable officer," at the time and under the circumstances, that the non-deadly force used against Livingston was constitutionally excessive. *Id.* at 2692. As the officers stress and the district court recognized, "[w]hether a right was clearly established must be particularized to the facts of the case and may not be defined at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). It is not enough, in other words, that it was clearly established in November of 2015 that the Fourth Amendment prohibits the use of excessive force generally; what matters is whether it was clearly established that the Fourth Amendment prohibited this use of force under these circumstances. Like the district court, we think it was.

Since at least 1994, when we decided *Rowland v. Perry*, 41 F.3d 167 (4th Cir.), it has been clear that serious physical force – there, a wrestling maneuver that cracked a suspect's knee – is constitutionally excessive when used against an individual suspected, at most, of a minor crime, who is unarmed, and who does not attempt to flee or physically attack the officer – even if the suspect offers passive resistance, struggling with the officer after an initial use of force against the suspect. *Id.* at 174; *see Terry v. Yates*, 817 F.3d 877, 888 (4th Cir. 2016) ("Even in a case that we decided in 1994, where an individual committed a minor crime, and there was some evidence of resistance, we denied qualified immunity to an officer who 'used a wrestling maneuver, throwing his weight against [the suspect's] right leg and wrenching the knee until it cracked.'") (quoting *Rowland*, 41 F.3d at 174). "[S]uch unfavorable *Graham* factors," we held, would allow a jury to find that "no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time." *Rowland*, 41 F.3d at 174.

We relied and elaborated on *Rowland* in *Smith v. Ray*, decided in March of 2015, before the incident here. In that case, we held that it was clearly established in 2006 that the constitutional line had been crossed when an officer, confronted with an individual suspected only of a misdemeanor and who passively resisted by refusing to give up her hands, responded by throwing her to the ground, kneeing her, and twisting her arm. *Smith*, 781 F.3d at 102–03. Especially in light of *Rowland*, we reasoned, no reasonable officer could have thought that level of force proportionate, as against an unarmed individual who resisted only passively and without striking at the officer, and who was suspected at most of a minor offense. *Id.* at 103. And notably, we rejected the view that the suspect's "refusal

21

to submit after [the officer] threw her down" without warning or explanation could justify, or reasonably be thought to justify, an escalation in force by the officer. *Id.*

We think *Rowland* and *Smith* made plain enough, in November of 2015, the excessive nature of the force used here. As in *Rowland* and *Smith*, the officers here used violent force against a person suspected, at most, of minor offenses; who was not armed and did not strike out at the officers; and who engaged in only passive resistance when the officers attempted to handcuff him. And by November of 2015, it was clearly established that Livingston's struggle with the officers *after* Kehagias illegally entered his home and immediately pulled him from his chair, pushed him against a wall, and brought him to the ground could not justify the officers' escalating use of force: It was clear from *Rowland*, we held in *Smith*, that when an officer takes "an unreasonably aggressive tack that quickly escalate[s] to a violent exchange when [a] suspect instinctively attempt[s] to defend himself," that passive resistance does not authorize additional violent measures by the officer. *Id.* at 104.

In arguing that the excessiveness of the non-deadly force they used in an effort to arrest Livingston was not clearly established, the officers point to fine factual distinctions between this case and *Rowland* and *Smith*, as well as other cases relied upon by the Estate. But as the district court explained, we "do not require a case directly on point" where existing authority puts a reasonable officer on notice of the relevant constitutional limits. J.A. 2692 (quoting *al-Kidd*, 563 U.S. at 741). And as we explained in *Rowland* and *Smith*, the *Graham* factors themselves, when they point clearly enough in one direction, can be enough to give an officer "fair warning," *see Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir.

22

2008), that his conduct is unconstitutional. *Rowland*, 41 F.3d at 174 (*Graham* factors may be so "unfavorable" that a jury could find no reasonable officer could have believed his use of force to be lawful); *Smith*, 781 F.3d at 104 ("[O]ur determination that the officer was not entitled to qualified immunity in *Rowland* was not based on any case that was factually on all fours.").

In any event, a parsing of the facts is not to the officers' benefit here. The most striking distinction between *Rowland* and *Smith*, on the one hand, and this case, on the other, is in the magnitude of the force used: The force ruled excessive, and clearly so, in *Rowland* and *Smith* involved throwing misdemeanor suspects to the ground and punching or wrestling them; here, on top of that kind of violent physical force, we also have multiple uses of pepper-spray, multiple uses of a taser, and a gun to the head. For much the same reason, and like the district court, we are unpersuaded by the officers' argument that it was not until 2016 that we established in *Armstrong* that use of a taser against a non-violent resister violates the Fourth Amendment. *See Armstrong*, 810 F.3d at 907. This case involves more than use of a taser, and when we look at the force used as a whole – not element by element or moment by moment, *see Rowland*, 41 F.3d at 173 (rejecting "segmented view of the sequence of events" and considering the total force used "in full context") – it is clear, and would have been clear to a reasonable officer at the time, that

the cumulative force deployed against Livingston was under the circumstances constitutionally excessive.[5]

## B.

### *Bethune*

Here again, Deputy Kehagias, this time accompanied by two officers, is alleged to have entered a home in the middle of the night and without a warrant, and to have used excessive non-deadly force while there. This incident began when Kehagias and his colleagues mistakenly arrived at the home of Tyrone Bethune while attempting to serve a warrant on a neighbor. Although Bethune and Ryan Holloway, also present, informed the officers that they were at the wrong address, Kehagias entered the home without a warrant or consent, pulled both men out of the house, slammed them against the porch, and put them in handcuffs.

---

[5] The officers also moved for summary judgment on the Estate of Livingston's state-law claims, based on state-law public officer immunity. Because it had denied summary judgment on federal qualified immunity grounds, the district court also denied summary judgment as to the state-law claims, and the officers now seek to appeal that ruling, as well. But interlocutory review of a denial of qualified immunity does not automatically confer jurisdiction over other issues in a case. *See Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 43–51 (1995). We may exercise pendent appellate jurisdiction only in limited circumstances, *see Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006), and even when pendent jurisdiction is available, "the decision to exercise such jurisdiction is purely discretionary." *Clem v. Corbeau*, 284 F.3d 543, 549 n.2 (4th Cir. 2002) (internal quotation marks omitted). Here, the officers have not directly asked us to exercise our pendent appellate jurisdiction over these state-law claims, nor have they given us any reason why we can and should. Accordingly, we decline to exercise any pendent jurisdiction that may be available to us, and dismiss the officers' appeal from the denial of summary judgment on the Estate of Livingston's state-law claims.

Bethune and Holloway sued the officers for unlawful seizure and for the use of excessive force. As to both claims, the district court denied the officers summary judgment based on qualified immunity. The officers now appeal, but only as to Bethune, and only as to his claim for unreasonable seizure.

1.

At around 2:30 a.m. on July 30, 2015, Deputies Kehagias, Werbelow, and Justin Thomas arrived at Bethune's home while attempting to serve a warrant on one of Bethune's neighbors, Robert Cox. Through the closed front door, Bethune asked why he needed to open his door, and Kehagias eventually asked if Cox was there. The two men in the home – Bethune and Holloway – responded that neither of them was Cox and that the deputies were at the wrong address. After some discussion, Holloway came out of the house to convince the officers that he was not Cox.

According to Bethune and Holloway, Deputy Kehagias then followed Holloway back inside, falsely claiming that Holloway had given him permission to search the house. After Kehagias admitted that he had no search warrant, Bethune told him to leave. Kehagias responded by pulling Holloway out of the home by his arm, slamming him into the porch railing, and handcuffing him as Bethune began to record the incident on his phone. Kehagias then pulled Bethune outside, pushed him against the side of the house, body-slammed him face-first into the ground, and handcuffed him, as well, chipping Bethune's tooth during the takedown. During the encounter, neither Bethune nor Holloway offered any physical resistance or attempted to flee.

25

According to Kehagias, he had probable cause to enter Bethune's home and make arrests because he smelled marijuana when he was at the door and because he knew that Bethune had an outstanding arrest warrant. Bethune and Holloway dispute both points, and although Bethune concedes that there was an arrest warrant outstanding against him at the time, he alleges that the deputies learned his name and then discovered that warrant only after he was handcuffed and placed in the officers' car.

2.

Bethune and Holloway sued the officers, alleging unreasonable seizures and the use of excessive force in violation of the Fourth Amendment. Viewing the pretrial record and disputed facts in the light most favorable to the plaintiffs, the district court denied the officers' motion for summary judgment based on qualified immunity.

As to the seizure claims, the district court concluded that genuine disputes of material fact precluded summary judgment. The officers' proffered justification for entering Bethune's home to make arrests, the court explained, rested entirely on "hotly contested" factual premises: that the officers had smelled marijuana from the doorway, and that they knew already about Bethune's outstanding arrest warrant. J.A. 2698. And at the second prong of the qualified immunity analysis – whether there was a violation of clearly established rights – the officers relied again on the same two disputed factual premises. The court concluded: "Because the facts relied on by defendants to argue that the rights violated were not clearly established are in dispute, defendants have not, based on plaintiffs' version of the facts, satisfied their burden to show that the right to be free

26

from arrest without probable cause . . . would not have been clear to a reasonable officer." *Id.* at 2699.

As to the excessive force claims, the district court concluded that on the plaintiffs' version of the facts, the force used by the officers was constitutionally excessive under *Graham*. "Although neither Bethune nor Holloway offered any physical resistance during the encounter, and there is no indication that either Bethune or Holloway was armed or in some other way known to the deputies to be dangerous, both were slammed into the porch resulting in injuries." *Id.* at 2698. And at the "clearly established" stage of the qualified immunity analysis, the court explained, the officers again relied on a disputed fact – this time, that Bethune actively resisted arrest – to argue that any Fourth Amendment violation was not clearly established at the time of the incident. Accordingly, summary judgment based on qualified immunity was not appropriate at this stage of the proceedings.

3.

We may dispense briefly with the officers' appeal as to this incident, limited to the denial of qualified immunity on Bethune's claim of unreasonable seizure. Again, the officers' argument on appeal focuses almost entirely on their disagreement with the district court's assessment of the pretrial record: According to the officers, the plaintiffs did *not* produce evidence creating a genuine issue of fact as to Kehagias's knowledge of Bethune's arrest warrant. But as we have explained, we have no jurisdiction to consider that kind of fact-based argument in this interlocutory posture, *see Gould*, 165 F.3d at 268 (finding no jurisdiction to consider "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial"), and so we dismiss this portion of the officers' appeal. *See Witt v. W. Virginia*

27

*State Police, Troop 2*, 633 F.3d 272, 277–78 (4th Cir. 2011) (dismissing appeal for lack of jurisdiction because officers' "attempt to rehash the factual disputes below provides no basis for interlocutory appeal of the district court's order denying summary judgment on qualified immunity grounds") (internal quotation marks omitted). [6]

## C.

### *Cardwell*

This final incident on appeal raises a new issue: the circumstances that will give rise to probable cause for a mental health seizure. Sometime after midnight on May 12, 2015, Deputy Kehagias and two other deputies responded to 911 calls made by Michael Cardwell, which were classified by the 911 dispatcher as related to an attempted suicide. They found Cardwell in his driveway, where he paced and gesticulated while speaking about his frustrations with the Department of Veterans Affairs, and threw a beer can toward the back of his truck and away from the officers. Kehagias tackled Cardwell to the ground

---

[6] The officers also argue on appeal that they are entitled to qualified immunity as a matter of law because even if Kehagias did *not* know about Bethune's warrant when he seized Bethune, it does not violate the Fourth Amendment – or at least, clearly established Fourth Amendment law – to seize an individual with an outstanding warrant of which the arresting officer is unaware. It appears that the officers raised this argument for the first time before the district court in their reply brief on summary judgment. The district court did not address it, likely because it deemed the issue waived. *See Zinner v. Olenych*, 108 F. Supp. 3d 369, 398 (E.D. Va. 2015) ("Typically, courts will not consider an argument raised for the first time in a reply brief."). Regardless, it was clearly established at the time of the incident that "[i]n assessing the existence of probable cause, courts examine the totality of the circumstances *known to the officer* at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (emphasis added).

and handcuffed him, breaking Cardwell's leg and rib. The deputies also pepper-sprayed Cardwell multiple times, even after Cardwell had been handcuffed and seated in a chair.

Cardwell sued the officers, claiming that he was arrested without the probable cause necessary for a mental health seizure and subjected to excessive force, both in violation of the Fourth Amendment. The district court denied the officers' motion for summary judgment based on qualified immunity, and the officers appeal, but only as to the unreasonable seizure claim.

1.

This incident began when, at around midnight, 65-year-old Cardwell made two calls to 911, telling the dispatcher that he needed help. The 911 call record indicates that the dispatcher believed that Cardwell may have attempted suicide, but also that Cardwell "just needed someone to talk to." J.A. 2696. Cardwell denies telling the 911 dispatcher that he was suicidal.

When Deputies Kehagias, along with colleagues Michael Brandon Klingman, and John Knight, arrived at his residence that night, Cardwell was in his driveway with his truck. According to Cardwell, when he asked the officers their names, Klingman replied, "Donald Duck." J.A. 2680. When Cardwell asked them to turn on the video recording devices in their vehicles, Kehagias responded, "We don't got no video." *Id.* at 2679. Cardwell then asked if the officers were veterans, and when they said they were not, Cardwell picked up a beer can and threw it at the back of his truck, away from the officers. While pacing back and forth and gesticulating with his hands, Cardwell spoke about his frustrations with the Department of Veteran Affairs.

29

As Cardwell was speaking, Deputy Kehagias inched his way toward him and, without warning, "rushed [him] like a linebacker" and slammed him to the ground, immobilizing him. *Id.* at 2680. While Kehagias held Cardwell's hand over his head, Klingman pepper-sprayed Cardwell in the face. After being handcuffed, Cardwell recalls Kehagias pepper-spraying him, too, while pressing a knee into his back. The officers moved Cardwell to a chair in the driveway, where he sat in handcuffs as Kehagias pepper-sprayed him again.

The officers called for medical assistance for Cardwell's leg pain and for pepper-spray decontamination. After paramedics arrived at the scene and advised that Cardwell should be taken to a hospital, Cardwell was admitted to a hospital at approximately 2:00 a.m. with a fractured leg and rib. While his blood alcohol concentration was elevated, Cardwell was alert and not clinically intoxicated. Though Cardwell was charged with resisting arrest, that charge ultimately was dismissed.

2.

Once again, the district court denied the officers' motion for summary judgment on qualified immunity grounds. As to the unreasonable seizure claim, the district court explained, the Fourth Amendment allows for an arrest for a mental health evaluation when there is probable cause that an individual poses a danger to himself or others. *Id.* at 2695 (citing *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009)). Here, the court reasoned, although the 911 dispatcher conveyed to the officers a potential suicide threat, a 911 call reporting a suicide risk has been held insufficient to establish probable cause for a mental health seizure – a point the officers conceded. *Id.* at

30

2696 (citing *Bailey*, 349 F.3d at 740). And, critically, the additional information the officers obtained once they arrived at Cardwell's house – Cardwell's pacing in his driveway, his "speech" about veterans issues, the throwing of the beer can away from the officers – still fell short of probable cause that Cardwell was a threat to himself or others. Finally, the court applied the "clearly established" prong of the qualified immunity analysis, recognizing that "the existence of probable cause for a mental health seizure is not easily reduced to bright-line rules" but holding that it would have been clear to a reasonable officer that there was no probable cause to seize Cardwell for a mental health evaluation. *Id.* at 2697.

As to the excessive force claim, the district court applied the *Graham* factors to the facts taken in the light most favorable to Cardwell, and concluded that the force used against Cardwell was disproportionate to the circumstances confronting the officers: an individual suspected of committing no crime, unarmed, who offered little or no resistance "even after he had been body-slammed on the driveway." *Id.* at 2696. And Cardwell's right to be free of the force deployed against him was "clearly established": "[I]t was plainly clearly established that use of force which would result in a broken hip and rib as well as deployment of a full can of pepper spray to the face of an individual who is not resisting would be excessive." *Id.* at 2697.

3.

The officers appeal only the denial of summary judgment on Cardwell's unreasonable seizure claim. Here, the officers have raised a legal argument that we may review in this interlocutory posture, contending that on the facts as viewed by the district

court, they are entitled to qualified immunity as a matter of law: Either they did have probable cause to seize Cardwell for a mental health evaluation or, if they did not, then the lack of probable cause was not "clearly established" at the time of the incident. We agree with the officers on their second point, and hold that they are entitled to summary judgment on their qualified immunity defense because it was not clearly established that they lacked probable cause for a mental health seizure.

In order to undertake a mental health seizure, "an officer must have probable cause to believe that the individual posed a danger to [him]self or others." *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 266 (4th Cir. 1998). That much is clear. But what exactly counts as probable cause in this context, we have recognized, is less certain: There is a "distinct lack of clarity in the law governing seizures for psychological evaluations, compared with the painstaking definition of probable cause in the criminal arrest context." *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (internal quotation marks and alteration omitted).

On the one hand, as Cardwell argues, we held in *Bailey v. Kennedy*, in 2003, that a call to 911 reporting that a neighbor was suicidal did not by itself justify a mental health seizure under the probable cause standard. 349 F.3d at 741. And where the officers were met on their arrival with an individual sitting at his dining room table having lunch, denying any thoughts of suicide, there was no other evidence to support probable cause. *Id.* at 739–41. On the other hand, as the officers emphasize, we did find probable cause for a mental health seizure in *Cloaninger v. McDevitt*, in 2009, based in part on a call to a veterans' hospital by Cloaninger; although there was a dispute as to what exactly Cloaninger said, it

was reported to the police as a potential suicide. 555 F.3d at 332. Upon the officers' arrival, Cloaninger refused to communicate with them. *Id.* Based on those facts and the officers' knowledge that Cloaninger previously had attempted suicide and was believed to have firearms in his home, a mental health seizure was justified. *Id.* at 332–33.

We think this case falls somewhere between *Bailey* and *Cloaninger*, the cases most directly on point, so that a reasonable officer would be left without clear guidance as to whether probable cause existed. Some of the indicia on which we relied to find probable cause in *Cloaninger* are absent here: Cardwell did not refuse to respond to the officers when they arrived, and there was no knowledge of a prior suicide attempt or guns on the premises. But as the officers argue, *Bailey*, too, is distinguishable: Here, the call that gave rise to a suicide concern came not from a third party but from Cardwell himself, and when the officers arrived, instead of a person calmly eating lunch, they were confronted with an agitated Cardwell pacing his driveway at midnight, venting his frustrations, and throwing a beer can. We need not decide on what side of the probable-cause line this case falls. It is enough to say that it was not clearly established, at the time of the incident, that the officers lacked probable cause for a mental health seizure, and that they therefore are entitled to qualified immunity as a matter of law.[7]

---

[7] The district court identified a dispute of fact as to exactly which officers were at Cardwell's house on the night in question: Although the officers argued that it was an intern, and not Deputy Knight, who accompanied Deputies Kehagias and Klingman, Cardwell testified that Knight was present during the incident. Accordingly, the court denied summary judgment to Knight, and because that ruling was based solely on the existence of a factual dispute, we have no jurisdiction to consider any challenge to it here. *See Iko*, 535 F.3d at 237. But our holding that Kehagias and Klingman are entitled to

33

## IV.

For the reasons given above, the appeal is dismissed in part, and the judgment of the district court is affirmed in part and reversed in part.  We remand for further proceedings consistent with this opinion.

*DISMISSED IN PART; JUDGMENT AFFIRMED IN PART,*
*REVERSED IN PART, AND REMANDED*

---

qualified immunity on the unreasonable seizure claim extends to Knight, as well, assuming he was present.  Cardwell's excessive force claim against Knight, however, will continue to go forward in the district court on remand.