**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-2115**

---

CAMERON LEWIS, individually,

        Plaintiff - Appellee,

v.

KEVIN CARABALLO, individually, and in his official capacity as a Maryland State Police Officer/Trooper,

        Defendant - Appellant,

and

DEPT. OF STATE POLICE/STATE OF MARYLAND,

        Defendant.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge.  (1:21-cv-01872-CCB)

---

Argued:  September 20, 2023                  Decided:  April 15, 2024

---

Before DIAZ, Chief Judge, WYNN, Circuit Judge, and KEENAN, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wynn wrote the majority opinion, in which Senior Judge Keenan joined. Chief Judge Diaz wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:** Phillip M. Pickus, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Pikesville, Maryland, for Appellant. Charles H. Seidell, MCDERMOTT, WILL & EMERY, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Stephanie A. Shipley, SHIPLEY LAW FIRM, Easton, Maryland; Paul W. Hughes, Alex C. Boota, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Appellee.

WYNN, Circuit Judge:

While executing an arrest in 2018, Maryland State Trooper Kevin Caraballo resorted to striking fifteen-year-old Cameron Lewis in the head with several successive blows. Lewis sued Caraballo in his individual capacity, bringing state and federal constitutional claims for excessive force and a state-law battery claim. Caraballo filed a motion for summary judgment on the grounds of qualified and statutory immunity, which the district court denied. This appeal followed.

Construing the facts in the light most favorable to Lewis, as we are required to do at this stage of the proceedings, we agree with the district court that disputes of material fact preclude summary judgment. A reasonable jury could find that Caraballo struck Lewis when the teenager did not pose a threat, was not actively resistant, and was subdued. Several consecutive closed-fist punches to the head of an arrestee in those conditions constitute excessive force. We further hold that Lewis's constitutional right to be free from excessive force in the form of head strikes was clearly established at the time of his arrest. Moreover, we hold that there is a genuine dispute of material fact as to whether Caraballo's actions amounted to gross negligence or malice, precluding summary judgment in his favor on his statutory immunity defense. We therefore affirm the district court's order denying Caraballo's motion for summary judgment.

I.

Because this case is before us on interlocutory appeal, we recount the facts as the district court found them. *See, e.g.*, *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005) ("In reviewing the denial of summary judgment based on qualified immunity, we accept

as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff."); *Hicks v. Ferreyra*, 965 F.3d 302, 305 (4th Cir. 2020) (same). "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." *Smith v. Ray*, 781 F.3d 95, 98 (4th Cir. 2015) (internal quotation marks and citation omitted).

The plaintiff, Lewis, "is a biracial male with a documented mental health condition" who, at the time of this incident, was fifteen years old. *Lewis v. Caraballo*, 2022 WL 4558218, at *1 (D. Md. Sept. 29, 2022). Defendant Caraballo is a Trooper First Class with the Maryland State Police.

During the early evening of July 28, 2018, Caraballo was on patrol when he received a radio call to respond to a domestic incident at an apartment complex. The call indicated the incident was "active" and "physical." J.A. 47.[1] Caraballo was the first officer to arrive at the complex, where he found fifteen-year-old Lewis pacing on a sidewalk and his mother, Crystal Lewis, crying nearby on her front steps. Caraballo approached Ms. Lewis, who told him that her son had physically assaulted her.

Carballo then approached Lewis, who clenched his fists, assumed a "fighting stance," and shouted, "[Y]o get the fuck away from me." *Caraballo*, 2022 WL 4558218, at *1. Caraballo tried talking to Lewis, but the teenager maintained a fighting position and continued yelling at him. There was no indication Lewis was armed.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

Sergeant Glenn Ray of the Greensboro Police Department in Greensboro, Maryland, then arrived wearing a body camera that captured the remainder of the encounter with Lewis, which lasted about two minutes.

As Ray arrived, Caraballo was following Lewis, who was backing away and telling Caraballo not to touch him. Ray joined Caraballo and asked Lewis, "[W]hat's going on?" *Id.* at *2. Lewis continued backing away, repeatedly telling the officers not to touch him. Lewis then moved off the sidewalk, backed into the parking lot between two parked cars, and shouted at the officers to "get the fuck away from me." *Id.* The officers continued advancing toward him.

Ray then reached out toward Lewis and, for the first time, ordered him to stop. In response, Lewis clenched his fists below his waist, bent his knees, and shouted, "[A]in't nobody fucking playing with you." *Id.* Ray responded, "I'm not gonna be scared by that," and again asked, "[W]hat's going on?" *Id.* Lewis took a few steps away from the officers, then "resum[ed] his hostile, clenched-fist stance and repeat[ed] his demand not to be touched." *Id.*

Several seconds later, Ray pointed his taser at Lewis and warned, "I'll tase you, I don't care how old you are. Stop! Put your hands behind your back." J.A. 65 (Video Exhibit) at 2:12–2:16. Lewis responded, "[N]o," and Ray repeated his command for Lewis to place his hands behind his back. *Caraballo*, 2022 WL 4558218, at *2. Lewis asked "why," and Ray ordered Lewis to "do it now." *Id.* Lewis again asked "why" before shouting, "[Y]'all don't touch me." *Id.*

5

Without verbal warning, both officers—who are visibly larger than Lewis—lunged toward the teenager, grabbed him by the front of his shirt, and shoved him backward into the grassy area in the parking lot.

Lewis's claims arise from Caraballo's actions over the next twenty-five seconds. The video becomes obscured and is interrupted intermittently because of Ray's proximity to Lewis's body. The district court found that the next clear image is of "Caraballo on the ground, using his weight to drag Lewis down while Sergeant Ray pushes from above. This successfully brings Lewis to his hands and knees, and Sergeant Ray is then able to force Lewis the rest of the way to the ground, facedown." *Id.* (citations omitted).

Caraballo then deployed three kinds of force against Lewis. *Id.* First, though the footage becomes unclear again, Caraballo attested that he "executed three (3) elbow strikes to the back of Mr. Lewis' shoulder area" while Lewis was still on his hands and knees with his face down. *Id.*

Next, Caraballo executed knee strikes on Lewis, who was still down. Lewis claimed that Caraballo "forcibly knee[d] [Lewis] in the head," while Caraballo claimed his knee strikes hit Lewis's rib area. *Id.* at *3.

After the elbow and knee strikes came Caraballo's head strikes. The district court found that Caraballo moved over Lewis, "adopt[ed] a boxer-like stance," and struck Lewis's head area "approximately five times" as Lewis screamed in pain. *Id.* The video shows Caraballo punching downward at Lewis with alternating swings and hitting the area around the back of Lewis's head or left shoulder, but it does not show precisely where the blows landed. The court cited Caraballo's attestation that he "executed five (5)

closed fist strikes," "striking Mr. Lewis 4 total times in the head area." *Id.*

As Caraballo struck Lewis's head, Ray tased Lewis. Though not visible, the sound of the taser discharging can be heard in the body-camera video. The district court found that the video "appears to show" that the taser's clicking noise, indicating discharge, began after the "first one to two head strikes." *Id.* Caraballo later claimed he was unaware Ray was simultaneously tasing Lewis.

After Ray tased Lewis, Lewis became fully compliant, and Caraballo relented. The officers ordered Lewis to place his hands behind his back and handcuffed him. At this point, a third officer is visible in the video, assisting Caraballo and Ray. As Lewis repeatedly pled with the officers to let him get up, Caraballo pulled Lewis up, saying, "[Y]eah, get the fuck up motherfucker." J.A. 65 (Video Exhibit) at 3:33–3:40. Caraballo later stated in a Declaration that he broke his prescription glasses during the altercation, and Ray's incident report stated that those glasses cost about $600. After the officers pulled Lewis up and took him to the police car, Caraballo remarked that his glasses were "fucking shattered." *Id.* at 5:20–5:27.

The district court found that throughout this interaction, Lewis could be heard "yelling in pain and protest" and could "be seen struggling with the officers." *Caraballo*, 2022 WL 4558218, at *3. While Caraballo characterized these reactions as Lewis "resisting" arrest, the court found that, viewing these actions in the light most favorable to Lewis, they may "merely have been a natural response to the physical nature of the arrest." *Id.* at *3, *6.

The court also determined that, at the time Caraballo began striking Lewis's head,

7

the video was "inconclusive" as to the position of Lewis's hands, the degree to which he may have been handcuffed, and whether the third officer had already arrived. *Id.* at \*3. Finally, the court found that when Caraballo began striking Lewis's head, "[Lewis] was at least partially subdued." *Id.* at \*6.

On July 27, 2021, Lewis sued Caraballo in his individual capacity for excessive force in violation of the Fourth and Fourteenth Amendments and the corresponding Articles 24 and 26 of the Maryland Declaration of Rights, and for battery under state tort law.[2] *See French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008) (noting that where "an officer uses excessive force, . . . [the] officer's nonprivileged use of force constitutes battery" (emphasis omitted) (quoting Sonja Larsen & Thomas Muskus, 6A C.J.S. *Assault* § 35 (2008 Supp.))).

Caraballo moved for summary judgment, arguing that he was entitled to qualified and state statutory immunity because his use of force was reasonable. The district court denied Caraballo's motion. *Caraballo*, 2022 WL 4558218, at \*7–8. It found that the evidence, viewed in the light most favorable to Lewis and drawing all reasonable inferences in his favor, created a genuine dispute of fact as to whether Caraballo used excessive force, thus precluding summary judgment on the basis of qualified immunity.

---

[2] Lewis also brought claims against Caraballo, individually and in his capacity as a Maryland State Police Officer, and against the Maryland Department of State Police, for denying him access to the courts in violation of the United States and Maryland Constitutions; civil conspiracy in violation of the Maryland Constitution; and intentional infliction of emotional distress under state tort law. *Caraballo*, 2022 WL 4558218, at \*1. The district court dismissed the claims against the Maryland State Police and Caraballo in his official capacity, and the remaining claims against Caraballo in his individual capacity. *Id.* at \*5, \*8. Those claims are not at issue in this appeal.

8

*Id.* at \*7. Likewise, the court found that a genuine dispute of fact remained as to whether Caraballo acted with gross negligence, precluding statutory immunity for Lewis's state battery claim. *Id.*

Caraballo timely filed this interlocutory appeal.

II.

Ordinarily, we lack jurisdiction to review the denial of a motion for summary judgment, because such denial does not constitute a final order. *Williams v. Strickland,* 917 F.3d 763, 767 (4th Cir. 2019); *see* 28 U.S.C. § 1291. However, under the collateral order doctrine, we may conduct a limited interlocutory review of a district court's denial of summary judgment based on qualified or statutory immunity.[3] *Williams*, 917 F.3d at 767–68; *R.A. v. Johnson*, 36 F.4th 537, 541 (4th Cir. 2022). In an interlocutory appeal, our review of the denial of summary judgment is limited to questions of law. *Williams*, 917 F.3d at 768; *see also Pfaller v. Amonette*, 55 F.4th 436, 444 (4th Cir. 2022).

---

[3] Pursuant to the Maryland Tort Claims Act, Caraballo invoked statutory immunity from Lewis's Maryland Declaration of Rights and state battery claims. *See* Md. Code, State Gov't § 12-105; Md. Code, Cts. & Jud. Proc. § 5-522(b). We may review a district court's order denying statutory immunity under the collateral order doctrine only if the state law provides "immunity from suit rather than a mere defense to liability." *Argonaut Great Cent. Ins. Co. v. Audrain Cnty. Joint Commc'ns*, 781 F.3d 925, 929 (8th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also R.A. v. Johnson*, 36 F.4th 537, 541 (4th Cir. 2022) (same). In Maryland, the Tort Claims Act provides state employees with true immunity from suit. *See, e.g., Walker v. Maryland*, 2017 WL 3730349, at \*8 (D. Md. Aug. 30, 2017) (holding that under the Tort Claims Act, state personnel are "immune from suit"); *Usiak v. Brown*, 2011 WL 3705349, at \*6 (D. Md. Aug. 23, 2011) ("[I]t is clear that the Defendants are immune from suit under the . . . Maryland Tort Claims Act."). Therefore, district court orders denying statutory immunity under Maryland state law are appealable in federal court to the same extent as those denying federal qualified immunity.

9

We review de novo a district court's denial of summary judgment. *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019). Summary judgment is appropriate when there are no material facts in dispute, and the movant is entitled to judgment as a matter of law. *Id.*; *see* Fed. R. Civ. P. 56(a). We construe the evidence in the light most favorable to Lewis, the non-moving party. *Belue*, 942 F.3d at 190; *see also Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218 (4th Cir. 2018).

Because in this procedural posture we only decide issues of law, we do not weigh the evidence, credit the movant's evidence, make credibility determinations, or decide whether the evidence is sufficient to permit a particular finding of fact. *See Prince George's Cnty.*, 893 F.3d at 218–19; *see also Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017) ("In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor."); *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008) ("[W]e possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the facts actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them." (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc))).

Instead, we answer only one "narrow legal question: if we take the facts as the district court gives them to us, and we view those facts in the light most favorable to the plaintiff, is the defendant still entitled to qualified [or statutory] immunity?" *Williams*, 917 F.3d at 768 (footnote omitted) (citing *Iko*, 535 F.3d at 234); *see also Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) ("[E]ven if the district court concludes

10

that controverted issues of fact remain, an appellate court may consider the legal question of whether the defendant's conduct, taken as alleged by the plaintiff, violates clearly established law." (citing *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996))).

Caraballo attempts to circumvent this jurisdictional limitation by invoking the one narrow exception pursuant to the Supreme Court's decision in *Scott v. Harris*—we may reject the district court's factual findings to the extent they are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). This standard "is a very difficult one to satisfy." *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1177 (10th Cir. 2020) (cleaned up). It is met only when "[the plaintiff's] version of events is so *utterly discredited* by the record" that it constitutes "visible fiction," such that "no reasonable jury could . . . believe[] [it]." *Scott*, 550 U.S. at 380–81 (emphasis added).

In *Scott*, for example, an officer's dashcam video depicted the plaintiff "run[ning] multiple red lights" and "swerv[ing] around more than a dozen other cars." *Id.* at 379. That was directly at odds with the plaintiff's assertions that he posed "little, if any, actual threat . . . [to] other motorists" and that "the roads were mostly empty." *Id.* at 378 (cleaned up). Because "[t]he videotape quite clearly contradict[ed]" the plaintiff's claims, the Supreme Court reversed the district court's determination that there was a genuine issue of fact as to whether the force used against the plaintiff was reasonable. *Id.* at 378, 386.

This Court, however, has emphasized that *Scott*'s holding is cabined to situations where documentary evidence "'*blatantly contradict[s]*' a plaintiff's account." *Witt v. W.V. State Police*, 633 F.3d 272, 276 (4th Cir. 2011) (emphasis added) (quoting *Scott*, 550 U.S.

at 380). Thus, where a video only "offers *some* support for [an] officer's version of events," we do not allow the officer to "rehash[] the factual dispute below." *Id.* at 276–77 (quoting *Iko*, 535 F.3d at 235). "*Scott* is the exception, not the rule," and we have clarified that it does not apply *even where* documentary evidence renders the plaintiff's story "unlikely," so long as it is not "utterly discredited." *Harris v. Pittman*, 927 F.3d 266, 275–76 (4th Cir. 2019) (citing *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010)).

Here, the body camera video falls far below that high bar. The footage captures Caraballo's attacks. To the extent it fails to completely corroborate Lewis's story, that failure is largely attributable to the video being "obscured" just before and during Caraballo's use of force. *Caraballo*, 2022 WL 4558218, at *2. The district court found that because of the "intermittent[]" "[]obstruct[ions]" and "interrupt[ions]," the video was "inconclusive as to the position of [Lewis's] hands, the degree to which he may have been handcuffed, and the involvement of a third officer." *Id.* at *2–3.

We have previously declined to disturb a district court's fact-finding when a video is unclear. For example, in *Witt v. West Virginia State Police*, the "soundless video" with "unreliable quality" made it "difficult to decipher . . . the true sequence of events" in the encounter between the plaintiff and the defendant police officers. *Witt*, 633 F.3d at 277. Because the events surrounding the use of force were unclear, we declined to apply *Scott*'s narrow exception to our review of the district court's fact-finding on an interlocutory appeal from a denial of qualified immunity. *Id.* (first citing *York v. City of Las Cruces*, 523 F.3d 1205, 1210–11 (10th Cir. 2008); and then citing *Hughes*, 606 F.3d

at 319–20); *see York*, 523 F.3d at 1210–11 (holding *Scott* inapplicable where documentary evidence recorded "only part of the incident"). We do the same here.

Caraballo also argues that Lewis did not provide any of his own evidence and that the party opposing summary judgment "may not rest upon mere allegations . . . of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Opening Br. at 15–16 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). But the video evidence, though inconclusive, is sufficient to move Lewis's allegations beyond mere "[u]nsupported speculation." *Felty v. Graves-Humphrey's Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

Accordingly, our review is limited to analyzing whether, in light of the facts as the district court found them, the district court erred in denying Caraballo's invocation of qualified and statutory immunity.

### III.

The defense of qualified immunity shields public officials from civil liability unless they violated a "statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 574 U.S. 13, 16 (2014). In determining whether qualified immunity applies, we consider whether (1) the official violated a statutory or constitutional right, and (2) that right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). We may address these prongs in either order, and if the officer succeeds at either prong, he is entitled to qualified immunity. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230,

13

238 (4th Cir. 2021). But here, we conclude that the district court correctly found that Caraballo was not so entitled.

### A.

We begin with the first prong of the qualified-immunity analysis and consider whether, viewing the facts in the light most favorable to Lewis, Caraballo breached Lewis's rights. The Fourth Amendment[4] protects citizens from "unreasonable seizures," U.S. Const. amend. IV, which includes "prohibit[ing] police officers from using force that is 'excessive' or not 'reasonable'" while making an arrest, *Meyers v. Baltimore*, 713 F.3d 723, 732 (4th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). We carefully "balanc[e] . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted).

Viewing the evidence in the light most favorable to Lewis, the district court found that a reasonable jury could conclude that Caraballo's force was "disproportionate because he continued punching Lewis in the head after Lewis was subdued or while Lewis was not resisting arrest." *Caraballo*, 2022 WL 4558218, at *6.

---

[4] Lewis asserted a 42 U.S.C. § 1983 claim for excessive force against Caraballo in violation of the Fourth and Fourteenth Amendments and a corresponding claim under Articles 24 and 26 of the Maryland Declaration of Rights. We analyze Articles 24 and 26 under the same standard as the Fourteenth and Fourth Amendments, respectively. *See Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); *Caraballo*, 2022 WL 4558218, at *5 ("Claims brought under Articles 24 and 26 . . . are interpreted as coextensive with their federal analogs, the Fourth and Fourteenth Amendments." (citation omitted)).

14

A court determines whether an officer's force was excessive based on a standard of "objective reasonableness." *Graham*, 490 U.S. at 399. "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97).

In *Graham*, the Supreme Court specified three factors for assessing the reasonableness of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. We agree with the majority of other circuits that have considered the question that, "[a]mong these considerations, the most important is the second factor—whether the suspect posed an immediate threat to others." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (citation and internal quotation marks omitted); *see Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (holding the second factor "is undoubtedly the most important" (internal quotation marks omitted)); *Malbrough v. Stelly*, 814 F. App'x 798, 803 (5th Cir. 2020) (same). *But see Glasscox v. Argo*, 903 F.3d 1207, 1214 (11th Cir. 2018) (indicating that "the most important factor" is whether the suspect "was actively resisting or attempting to evade arrest").

Additionally, the three *Graham* factors are not "exclusive," and we may identify other "objective circumstances potentially relevant to a determination of excessive force." *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). We keep an "eye toward the proportionality

15

of the force in light of all the circumstances." *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Smith*, 781 F.3d at 101).

We begin our analysis by assessing the "amount of force" used against Lewis. *Graham*, 490 U.S. at 397. We do so because the "factors articulated in *Graham* . . . are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quotation omitted); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (holding that the amount of force must be considered in light of the particular circumstances when it was used). Viewing the facts in the light most favorable to Lewis, Caraballo's use of force was significant. A jury could find that Caraballo exerted a high magnitude of force onto Lewis's head when he adopted "a boxer-like stance" and punched the teenager in the head "with powerful alternating swings." *Caraballo*, 2022 WL 4558218, at *3.

And we think it is common sense that the head is a particularly fragile part of the human body. It lacks a layer of muscle or fatty tissue that can absorb the impact of a blow, unlike body parts like the shoulder or thigh. Because the head contains the brain, it is commonly understood that head injuries can pose a substantial risk of serious and lasting physical harm. Courts have accordingly recognized the unique danger of strikes to the head. *See, e.g.*, *Davenport v. Causey*, 521 F.3d 544, 553–54 (6th Cir. 2008) (fist blows to the head could cause serious injury or death); *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (same); *cf. United States v. Mitchell*, 78 F.4th 661, 670 (4th Cir. 2023) (noting in the sentencing context that "as little as one punch to the head . . . may cause a

16

substantial risk of serious bodily injury within the meaning of the [Sentencing] Guidelines."). We have even held, albeit in an unpublished opinion, that several closed-fist strikes to the head could constitute deadly force. *See Thomas v. Holly*, 533 F. App'x 208, 221 (4th Cir. 2013) (orally argued but unpublished, per curiam decision). These decisions inform our conclusion that the closed-fist strikes at the very least constituted significant force.

With that understanding, we turn to the *Graham* factors to assess whether such force was reasonable. We agree with the district court that although the first *Graham* factor weighs in Caraballo's favor, the second and third factors weigh strongly in Lewis's favor.

The first factor, the severity of the crime, "slightly" favors Caraballo. *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012). When Caraballo responded to the scene, he was aware that Lewis's mother had contacted police to accuse Lewis of domestic violence, and when Caraballo arrived, she told him "her son had physically assaulted her." *Caraballo*, 2022 WL 4558218, at *1. However, there is no evidence that Lewis's mother was visibly injured or that any weapons were present. *Id.* at *1–3, *6. Those facts pointed toward an accusation of misdemeanor assault in the second degree. *Id.* at *6; *see* Md. Code, Crim. Law § 3-203(a). "[B]ecause assault is an offense that can be considered violent if committed by any person, . . . this factor weighs against [Lewis,]" but "[t]his finding is tempered" because the offense is a misdemeanor. *Dolgos*, 884 F.3d at 180; *accord Morris*, 672 F.3d at 1195 (holding that an officer's "amount of force used should

17

[be] reduced accordingly" in cases of misdemeanor assault (alteration in original) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008))).

The second and most important factor weighs strongly in Lewis's favor, because a reasonable jury could find that he posed no "*immediate* threat" to anyone's safety. *Graham*, 490 U.S. at 396 (emphasis added). To begin with, "Lewis was unarmed." *Caraballo*, 2022 WL 4558218, at *6. And Lewis did not attempt to attack the officers. *Id.* To the contrary, the video indicated that Lewis was *retreating* from the officers and that he never voluntarily touched them.

The only purported "threat" Lewis posed to the officers, then, was his "somewhat erratic conduct, his failure to comply with a small number of lawful commands, and two to three instances in which he clenched his fists" while the officers were far from Lewis's reach. *Id.*; *see Rice*, 989 F.3d at 1124 (holding that while erratic behavior could lead an officer to be wary, it does not give rise to an immediate threat). Further, after the officers deployed force and before Caraballo began striking Lewis's head, Lewis was under the weight of the two larger, trained officers and was "at least partially subdued." *Caraballo*, 2022 WL 4558218, at *6; *see Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (explaining courts may consider the "size and stature of the parties involved."); *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (noting officer was larger and trained). On these facts, we agree with the district court that Lewis posed no immediate danger to the officers.

Caraballo argues that the district court ignored the "danger [posed by Lewis] to [his] family." Opening Br. at 21. But no evidence suggests any "*immediate*" threat to

Lewis's family, as *Graham* requires. *Graham*, 490 U.S. at 396. While Lewis's mother was present when Caraballo arrived, the video does not show her close to Lewis when the officers initiated force against him. Rather, the video appears to show the teenager walking *away* from his mother's apartment well before the officers lunged at him. And when the officers initiated force, at least two officers were on top of Lewis and could have protected Ms. Lewis from the unarmed teenager even if she was nearby. Furthermore, again, Lewis was "partially subdued" before Caraballo began striking his head. *Caraballo*, 2022 WL 4558218, at *6. A jury could thus find that Lewis posed no reasonable threat that could have justified Caraballo's escalation of force.

The third factor, whether the suspect attempted to flee or actively resisted arrest, likewise supports Lewis. *Graham*, 490 U.S. at 396. Lewis made no attempt to flee, and while the court found that Lewis "struggled" in response to the officers' initiation of force, it found that "his resistance may merely have been a natural response to the physical nature of the arrest." *Caraballo*, 2022 WL 4558218, at *6. This Court has distinguished between active resistance and a suspect "defending [themselves] against a sudden all-out physical assault from an officer," and held that an officer cannot use a plaintiff's "slight resistance to the attack to justify his escalation of the conflict." *Smith*, 781 F.3d at 103. Caraballo's assault on Lewis's head, after elbow- and knee-striking him, constituted an escalation of force. Viewing the evidence in the light most favorable to Lewis, his response was a natural physical reaction to the officers' assault—a fearful reaction made all the more natural by his young age. And such a "frightened," "instict[ive]" response did not justify Caraballo's escalation. *Rowland*, 41 F.3d at 172.

19

Caraballo argues that even if Lewis's actions were a "natural response," a reasonable officer could only make split-second judgments based on Lewis's objective actions, and those demonstrated resistance. Opening Br. at 21. But we must view all disputed facts not blatantly contradicted by the evidence in Lewis's favor, and there is no blatant evidence of active resistance here. *Scott*, 550 U.S. at 380–81. Assuming arguendo that Lewis's actions constituted a display of some resistance, Caraballo's force was nevertheless unreasonable because it was not "commensurate with the suspect's level of contemporaneous, active resistance." *Joseph ex. rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020). A reasonable officer would not think that beating a non-dangerous suspect's head, after elbow- and knee-striking the suspect, was proportionate to the minimal resistance Lewis gave.[5]

In sum, turning "an eye toward *the proportionality* of the force in light of all the[se] circumstances," *Smith*, 781 F.3d at 101 (emphasis added) (quoting *Waterman*, 393 F.3d at 481), an officer striking the head of a non-dangerous, non-actively resistant, partially subdued adolescent would not be objectively reasonable. Even if the *Graham*

---

[5] Ray began tasing Lewis after Caraballo's "first one or two head strikes." *Caraballo*, 2022 WL 4558218, at *3. Caraballo claimed he did not know Ray was simultaneously tasing Lewis and the district court made no findings on that claim. *Id.* at *3, *6. But we note, and the lower court found, that the sound of the taser discharging is audible in the video. *Id.* at *3. Because we view the evidence in the light most favorable to Lewis, and draw all reasonable inferences in his favor, we assume that Caraballo could hear the taser. A jury could consider the fact that Caraballo could hear the taser, and accordingly find that Caraballo's remaining head strikes after the tasing began constituted excessive force. However, because we hold that a reasonable jury could find that Caraballo's *initiation* of the head strikes—which began before the tasing did—constituted excessive force, we do not factor the tasing into our analysis.

20

factors would have justified a limited degree of force, the strikes to Lewis's head were not a proportional response. Because a reasonable jury could find that Caraballo struck Lewis while the adolescent was non-dangerous, non-actively resistant, and partially subdued, there is a material question of fact as to whether Caraballo applied excessive force by striking Lewis several times in the head.

B.

We now turn to the second prong of the qualified-immunity analysis, "whether the [constitutional or statutory] violation was of a 'clearly established' right." *Valladares v. Cordero*, 552 F.3d 384, 388 (4th Cir. 2009) (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006)). A right is clearly established if, at the time of the alleged offense, "[t]he contours of the right [allegedly violated were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). We apply an objective standard and analyze this prong from the perspective of a reasonable officer. *See Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020).

To determine that a right is "[c]learly established," we need not conclude that "the very action in question has previously been held unlawful," but we must instead conclude that the unlawfulness of the official's conduct was apparent from preexisting law. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). We hence "consider not only already specifically adjudicated rights but also those manifestly included within more general applications of the core constitutional principles invoked." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th

21

Cir. 2017) (internal quotation marks omitted) (quoting *Wall v. Wade*, 741 F.3d 492, 502–03 (4th Cir. 2014)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine if a constitutional right is clearly established, we look to "controlling authority" or to a "robust 'consensus of cases of persuasive authority.'" *Ashcroft*, 563 U.S. at 742 (quoting *Wilson*, 526 U.S. at 617); *accord Owens*, 372 F.3d at 279. With these guiding principles in mind, we turn to the asserted right in this appeal.

The question before us is whether a non-dangerous, non-actively resistant, "at least partially subdued," arrestee's right to be free from excessive force in the form of head strikes was clearly established by 2018. *Caraballo*, 2022 WL 4558218, at *6. The district court concluded that it was clearly established that "assaulting a subdued arrestee after officers have mitigated the immediate threat to themselves is objectively unreasonable." *Id.* at *7. We agree.

At least two cases in this Circuit, *Kane v. Hargis* and *Valladares v. Cordero*, provided notice that Caraballo's use of force was unreasonable. *See Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993) (per curiam); *Valladares*, 552 F.3d at 390 (2009). As we recognized in *Estate of Jones v. City of Martinsburg*, our 1993 decision in *Kane* warned officers that it is unreasonable to escalate force against a non-dangerous suspect that is secured or under control, even if that control is brief. *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 668–69 (4th Cir. 2020). *Estate of Jones* recognized that, by 2013, "it was already clearly established that suspects can be *secured without handcuffs* when they are

pinned to the ground, and that such suspects cannot be subjected to further force." *Id.* at 668 (emphasis added). That is because, we explained, "[a]s early as 1993, this Court held [in *Kane*] that a reasonable officer would know that once he had pinned a 100-pound woman to the ground, he should not further shove her into the pavement, cracking her teeth" *Id.* (citing *Kane*, 987 F.2d at 1008).

Caraballo argues that Lewis was not fully "pinned" to the ground like the suspect in *Kane*. We find that distinction insignificant. The law can place officers on notice "even in novel factual circumstances," so long as the law provides "fair warning" that the officer's conduct was unconstitutional. *Booker*, 855 F.3d at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Here, the video moves too quickly to distinguish Lewis's position at the precise moment Caraballo began striking his head, but the district court found that Lewis was either on his hands and knees with his face down, or he was completely "[on] the ground, facedown," when Caraballo began striking his head. *Caraballo*, 2022 WL 4558218, at *2. Either way, we know Lewis was down under the weight of two visibly larger officers—as opposed to the one larger officer in *Kane*—when Caraballo deployed his head beatings. Moreover, the suspect in *Kane* had been actively resisting arrest and attempting to flee. *Kane*, 987 F.2d at 1007–08. By contrast, viewing the facts in the light most favorable to Lewis, his defensive maneuvers did not constitute active resistance and he did not attempt to flee. Thus, a *more* significant use of force was justified in *Kane* than here.

Similarly, in *Valladares v. Cordero*, we concluded a police officer used excessive force when he slammed an unarmed fifteen-year-old's head into a car. *Valladares*, 552

23

F.3d at 390. The teenage suspect had fallen to the ground, and because the officer "picked [him] up off the ground," and thus briefly had him "under full control," and "*then* forcefully shoved his face into his mother's car," this Court found that the officer used excessive force. *Id.* (emphasis added). As in *Valladares*, viewing the evidence in Lewis's favor, Lewis was under the officers' control, even if briefly, because he was partially subdued while kneeling on the ground under the officers' weight, before Caraballo began striking his head.

The attempts by Caraballo and our partially dissenting colleague to distinguish *Valladares* are unavailing. Caraballo argues that the teenager in *Valladares* was unambiguously handcuffed before the officer shoved his head into the car, and hence the teenager was more secure than Lewis. But again, it was clearly established before the events of this case that "suspects can be secured without handcuffs when they are pinned to the ground," even during incidents that move quickly. *Estate of Jones*, 961 F.3d at 668. Our colleague also distinguishes *Valladares* by arguing that, unlike Lewis, the teenager there "surrendered" before the officer slammed his head into the car. Dissenting Op. at 33–34. But the *Valladares* Court only concluded that the teenager "surrendered" because when the officer picked him up off the ground, he did not resist being lifted. *Valladares*, 552 F.3d at 390. Thus, the *Valladares* Court explained, the teenager's lack of resistance "signifie[d] a point of surrender." *Id.* Again, viewing the facts in the light most favorable to Lewis, he also did not actively resist the officers' use of force against him.

And, as with *Kane*, the facts that distinguish *Valladares* from the present case demonstrate that the force Caraballo employed was arguably more excessive than in

24

*Valladares*. In *Valladares*, the fifteen-year-old had pushed the officer before the officer's use of force, *id.* at 386–87, whereas here, Lewis was backing away from the officers and never attacked them. Additionally, as was the case with *Kane*, only one officer was pinning the plaintiff in *Valladares*, while at least two officers subdued Lewis here. Finally, the officer in *Valladares* slammed the teenager's head once, but Caraballo struck Lewis's head five times. We think *Valladares* and *Kane* made plain enough, before 2018, the excessive nature of the force used here. Both *Valladares* and *Kane* found excessive force when officers continued to assault non-dangerous, controlled suspects. That is precisely the case here. Viewing the evidence in the light most favorable to Lewis, Caraballo struck Lewis, a non-dangerous suspect, with his elbows, kneed him, and *then* swung his fists into the teenager's head after he was already partially subdued and kneeling under the weight of the two larger officers. Our cases thus constituted "fair warning" that Caraballo's use of force was excessive. *Booker*, 855 F.3d at 538.

Caraballo offers two cases to show that this right was not clearly established in 2018, but both are unpersuasive. First, in *Rivas-Villegas v. Cortesluna*, the Supreme Court found that an officer did not use excessive force in violation of clearly established law when the officer kneed a man who was kneeling on the floor, because that man was armed and the officer only kneed him briefly while handcuffing him. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 6–7 (2021) (per curiam). But the facts of that case are a far cry from those here. In *Rivas-Villegas*, the drunk suspect attempted to attack his girlfriend with a chainsaw, and when police arrived, he appeared to reach for a knife with which he was armed. *Id.* at 3–4. Once the suspect surrendered, the officer placed a knee on his back

25

while handcuffing him. *Id.* at 4. Notably, in finding that the officer's use of his knee did not violate clearly established law,[6] the Supreme Court distinguished *Rivas-Villegas* from the police conduct in *LaLonde v. County of Riverside*, which also involved an officer kneeing a suspect in the back. *Id.* at 6–7 (citing *LaLonde v. Cnty. of Riverside*, 204 F. 3d 947 (9th Cir. 2000)). The Court stressed that, unlike in *Rivas-Villegas*, the suspect in *LaLonde* was unarmed, had not threatened police, and suffered a more severe use of force than a brief knee to the back. *Id.* at 6–7. So, the Court concluded, *LaLonde* did not put the officer on notice that his conduct was unconstitutional. *Id.* at 7–8. By contrast, as discussed above, in this case, circuit precedent did put Caraballo on notice.

The second case Caraballo cites, *Pegg v. Hernberger*, is irrelevant. In *Pegg*, this Court held that an officer did not use excessive force when he only "performed a simple maneuver"—which did not involve kneeing, striking, or kicking the arrestee—to handcuff the suspect. *Pegg v. Hernberger*, 845 F.3d 112, 116, 120 (4th Cir. 2017). That factual scenario has no bearing on this case, where Caraballo struck Lewis's head several times after kneeing and elbowing him.

In sum, we hold the right of a suspect who was at the very least partially subdued and posed no immediate threat to be free from excessive force in the form of strikes to his head was clearly established at the time of the events of this case in 2018. We hence affirm the district court's denial of summary judgment to Caraballo based on Lewis's excessive-force claim under the Fourth and Fourteenth Amendments.

---

[6] The Court did not address whether there was a constitutional violation.

26

IV.

Lastly, Caraballo argues that he is immune from Lewis's state-law claims under the Maryland Tort Claims Act. That Act immunizes state personnel from suit for tortious conduct committed within the scope of their duties if committed "without malice or gross negligence." Md. Code, State Gov't § 12-105; *see* Md. Code, Cts. & Jud. Proc. § 5-522(b).[7] An officer's actions are grossly negligent when they "intentional[ly] fail[] to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and [their actions] impl[y] a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Dolgos*, 884 F.3d at 187 (quoting *Cooper v. Rodriguez*, 118 A.3d 829, 845–46 (Md. 2015)); *accord Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (collecting cases). Malice is defined as "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Pope*, 935 A.2d at 714 (quoting *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004)). Malice can be "inferred from acts and circumstantial evidence as it is seldom admitted and need not be proven by direct evidence." *Dolgos*, 884 F.3d at 187 (cleaned up). As with qualified immunity, our jurisdiction to review denials of summary judgment based on statutory immunity is limited to "legal questions" and we must accept the facts as the district court gave them to us in the light most favorable to Lewis. *Post v.*

---

[7] Maryland State Troopers are "State personnel," and therefore the immunity could apply to them if they meet the other statutory requirements. Md. Code, State Gov't § 12-101.

27

*City of Munroe Falls*, 861 F. App'x 69, 73 (6th Cir. 2021); *accord Reeves v. Meddings*, No. 21-2391, 2022 WL 17091862, at *4 (4th Cir. Nov. 21, 2022) (unpublished).

Unlike the use-of-force analysis, the question of whether an officer acted with gross negligence or malice is "subjective," and thus is "generally a question for the jury." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (cleaned up). Caraballo nonetheless contests the district court's finding of material disputes of fact as to whether he acted with malice or gross negligence. But taking the facts as the district court found them, as we must in this procedural posture, we agree with the district court that there is a genuine dispute of fact as to whether Caraballo acted with gross negligence or malice. The district court found disputes of fact regarding the position of Lewis's hands, the degree to which he was handcuffed, the involvement of a third officer, and whether Lewis resisted. *Caraballo*, 2022 WL 4558218, at *3. It is also unclear whether Caraballo knew Lewis was being tased. *Id.*

These facts are material to a jury's evaluation of Caraballo's gross negligence or malice, and a jury crediting Lewis's account could find on these facts that Caraballo acted with gross negligence, or a "disregard of the consequences," by inflicting unnecessary pain and aggression on the subdued, non-dangerous adolescent in a manner that posed a danger to Lewis's long-term health. *Dolgos*, 884 F.3d at 187; *see Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1035 (Md. 2004) (gross negligence is "akin to reckless conduct"). A reasonable jury could alternatively find that Caraballo acted with malice or "ill-will," *Dolgos*, 884 F.3d at 187, based on such evidence as that Lewis had failed to comply with the officers before their infliction of force, that Caraballo was

28

angered when he lost his prescription glasses during the struggle, and that Caraballo called Lewis a "motherfucker" after beating his head. J.A. 65 (Video Exhibit) at 3:33–3:40; *see Okwa v. Harper*, 757 A.2d 118, 129 (Md. 2000) (holding that the fact that "peace officers beat a citizen about his head and neck while they twisted his thumbs[] could support an inference [of] malicious intention . . . which would strip" immunity under Maryland statutory law because "it would not be unreasonable for a fact finder to infer that [the officers] were motivated by an extreme and overzealous desire to punish [the suspect] for failing to obey immediately their instructions"); *Sherrill v. Cunningham*, No. JKB-18-476, 2018 WL 3533550, at *8 (D. Md. July 23, 2018) (finding that jury could infer ill-will from officer's escalation of violence by throwing plaintiff on the ground and throwing her belongings, when plaintiff alleged she was compliant and non-threatening); *cf. Lopp v. Anderson*, 795 S.E.2d 770, 777 (N.C. Ct. App. 2016) (applying analogous North Carolina definition of malice and finding that "unnecessarily rough treatment" alleged by the plaintiff against defendant officer is sufficient to overcome summary judgment because the officer acted with malice (citing *Thompson v. Town of Dallas*, 543 S.E.2d 901, 905–06 (N.C. Ct. App. 2001))).

Simply put, given the totality of the facts and the unique dangers of a head strike, a juror could find that Caraballo's five head strikes constituted an "intent to injure," or at least the reckless disregard of such a risk. *Pope*, 935 A.2d at 714 (quoting *Cline*, 863 A.2d at 311). We reiterate that we may only determine matters of law in this procedural posture, and thus may not address the questions of malice or gross negligence unless the

29

facts clearly show that no reasonable juror could find that Caraballo's actions amounted to either. That is not the case here.

Thus, the district court did not err in denying summary judgment on Lewis's state-law claims.

## V.

Based on the foregoing, we conclude Caraballo is not entitled to qualified or statutory immunity from Lewis's claims. We therefore affirm the district court's denial of Caraballo's motion for summary judgment.

*AFFIRMED*

30

DIAZ, Chief Judge, concurring in part and dissenting in part:

The qualified immunity doctrine protects an officer who violates the law, so long as he wasn't on notice that his conduct was unlawful. Taking the facts in the light most favorable to Cameron Lewis, as we do at this stage of the litigation, Officer Kevin Caraballo may have used excessive force when he punched Lewis (a teenage boy) five times in the head. But because I disagree with the majority that Lewis's rights were clearly established, I dissent in part.

## I.

Qualified immunity is a two-prong inquiry, and Lewis must establish both to succeed on his excessive force claim. *Harris v. Pittman*, 927 F.3d 266, 279 (4th Cir. 2019) (cleaned up). First, he must show that Caraballo violated one of his constitutional rights, and second, he must show that the "right at issue was clearly established at the time of the officer's conduct," *id.* (cleaned up), "such that a reasonable person would have known that his conduct was unconstitutional," *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015) (cleaned up).

I agree with the majority that (taking the facts as the district court found them) Caraballo may have violated Lewis's constitutional right to be free from excessive force. Lewis was 15 years old and unarmed during the altercation with the officers. And the district court found that "he posed little threat to the broader public." *Lewis v. Caraballo*, No. CCB-21-1872, 2022 WL 4558218, at *6 (D. Md. Sept. 29, 2022). Punching Lewis in the head five times—while another officer tased him—could have caused him serious

31

injury.  Even if Caraballo could use *some* force to subdue Lewis, the force used may have been disproportionate.  *See Smith*, 781 F.3d at 101 (cleaned up).

But I diverge on the clearly established prong.  When we define the clearly established right, we must take care to do so with the "appropriate level of specificity." *Estate of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 667 (4th Cir. 2020).  We must then examine "cases of controlling authority in [this] jurisdiction—that is, decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose," to determine whether a reasonable officer would be on notice that his actions violate the law.  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (cleaned up).  We may also "look to a consensus of cases of persuasive authority from other jurisdictions, if such [a consensus] exists." *Id.* at 539 (cleaned up).  If the plaintiff can't identify any controlling authority, or any such consensus, the right isn't clearly established.  *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 908–09 (4th Cir. 2016).

Of course, the facts of such cases need not be identical.  Officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  But even so, the law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up); *see also Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 2002) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (cleaned up)).

Lewis's challenge fails at the second prong: he hasn't specified a clearly established right. The majority defines the right at issue as "a non-dangerous, non-actively resistant, 'at least partially subdued,' arrestee's right to be free from excessive force in the form of head strikes." Maj. Op. at 22 (quoting *Caraballo*, 2022 WL 4558218, at *6). While I agree that a *subdued* arrestee has a clearly established right to be free from excessive force, that's not this case.

To start, I question the premise that an arrestee may be merely "partially subdued." Either a suspect is subdued, or he's not. Otherwise, how is an officer to determine whether force is or isn't authorized?

But most importantly, the cases the majority cites concern subdued arrestees, so I can't agree that they put Caraballo on notice that his use of force was excessive. Take *Kane v. Hargis*, 987 F.2d 1005 (4th Cir. 1993). There, we held that it was unreasonable for a police officer to use force against an arrestee half his size after he pinned her to the ground. *Id.* at 1008. But unlike here, nothing in *Kane* suggests that the arrestee continued to struggle or was only "partially" subdued. So I disagree that *Kane* would put Caraballo on notice that he couldn't use force against Lewis.

Likewise, in *Valladares v. Cordero*, we held that it was unreasonable for a police officer to slam a 15-year-old arrestee's head into a car after the arrestee "surrendered." 552 F.3d 384, 390 (4th Cir. 2009). But there, taking the facts in the light most favorable to the arrestee, we found that the arrestee was under the officer's "full control" when the officer broke his jaw. *Id.* Indeed, the officer was even able to pick the arrestee off the

33

ground, and "neither party testifie[d] that [the arrestee] resisted being lifted up." *Id.* That moment then "signifie[d] a point of surrender." *Id.*

By contrast here, Lewis was *not* under Caraballo's "full control" when Caraballo struck him in the head. As the majority explains, Lewis was only "*partially* subdued while kneeling on the ground under the officers' weight." Maj. Op. at 24 (emphasis added). So unlike in *Valladares*, there was no clear "point of surrender." 552 F.3d at 390. Caraballo thus wasn't on notice that using force to subdue Lewis would violate his constitutional rights.

I agree that it was clearly established that "suspects can be secured without handcuffs when they are pinned to the ground, and that such suspects cannot be subjected to further force." *Estate of Jones*, 961 F.3d at 668–69. But here, Lewis wasn't "secured."

Perhaps Caraballo's use of force was less reasonable than the officer's in *Valladares*, since unlike in that case, Lewis never attacked Caraballo. *See* Maj. Op. at 24–25; *cf. Valladares*, 552 F.3d at 387. But those circumstances go to whether Caraballo's use of force was reasonable, rather than whether Lewis's proffered right was clearly established.

Neither Lewis nor the majority have identified a published case involving the use of force against a "partially subdued" arrestee, nor pointed to any other "consensus of cases of persuasive authority." *See Booker*, 855 F.3d at 539 (cleaned up). So even if Caraballo's use of force was unreasonable, I can't agree that it violated Lewis's clearly established right.

34

II.

Lewis also argues that it was clearly established that Caraballo couldn't employ "repeated punches to the head with great strength" to arrest Lewis. Appellee's Br. at 44. The majority doesn't reach this argument, since it holds that Caraballo violated Lewis's other proposed clearly established right. In my view, this argument also fails.

Lewis's alternative right suffers the same infirmity as his first proposed right: he can't identify an analogous controlling case or a consensus of persuasive authority. He offers *Thomas v. Holly*, where we wrote that the officers' head strikes could have amounted to deadly force and were thus unreasonable. *See* 533 F. App'x 208, 219 (4th Cir. 2013) (per curiam). But *Thomas* is unpublished, so it wouldn't put a reasonable officer on notice that the use of head strikes to subdue a resisting arrestee is excessive. *See Booker*, 855 F.3d at 542–43 ("[B]ecause . . . unpublished opinions 'are not even regarded as binding precedent in our circuit,' . . . they 'cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity.'") (quoting *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc))).

Lewis claims that even if there's no binding Fourth Circuit precedent, a "consensus of cases of persuasive authority" from other circuits clearly establishes the right. *See id.* (cleaned up). But most of the cases he cites involved more than just hand strikes, or are otherwise inapposite. *See Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022) (officer struck suspect with flashlight or "similar blunt object"); *Zion v. County*

35

*of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (officer stomped on suspect's head after shooting him); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1057 (9th Cir. 2007) (officer punched handcuffed suspect in the face, while he lay face down on the ground, after throwing him head-first into a wall multiple times); *Davenport v. Causey*, 521 F.3d 544, 552–53 (6th Cir. 2008) (officer's use of deadly force against suspect was justified because *suspect* had hit *officer* in the head, and *suspect*'s "closed-fisted blows may constitute deadly force" (cleaned up)).

Lewis's strongest case is *Sallenger v. Oakes*, where the Seventh Circuit found that a closed-fist blow to the plaintiff's head could be deadly force and was thus unreasonable. 473 F.3d 731, 740 (7th Cir. 2007). Even so, one case isn't a "consensus" and couldn't put Caraballo on notice that his use of force was unreasonable. So this proposed right fails too.

## III.

Though I disagree with the majority on the clearly established prong of the qualified immunity inquiry, I concur that, taking the facts in the light most favorable to Lewis, Caraballo wouldn't be entitled to Maryland statutory immunity under the Maryland Tort Claims Act. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). Whether an officer is entitled to such immunity is typically a question for the jury. *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (en banc) (citing *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1034 (Md. 2004)).

Here, a jury could find that Caraballo subjected Lewis to excessive force under the Maryland Declaration of Rights.  *See Randall v. Peaco*, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007) (holding that the standard for analyzing excessive force claims under Maryland state law is the same for analyzing Fourth Amendment claims (cleaned up)).  And because there remain disputes of material fact about whether Caraballo acted with either gross negligence or malice, I would affirm the district court's denial of summary judgment on Lewis's state-law claims.

IV.

Officer Caraballo's use of force may have been unreasonable.  But at the time of the incident, it wasn't clearly established that Caraballo couldn't use head strikes to subdue Lewis.  And if Lewis was only *partially* subdued—i.e., not fully subdued—no case would have put Caraballo on notice that the force he did use was excessive.

I respectfully dissent on the qualified immunity issue.